*Howard Jimmy Davis v. State of Maryland,* No. 51, September Term 2020, Opinion by Wilner, J.

**CRIMINAL PROCEDURE LAW – CP § 4-202(d) -** When he was 16, petitioner participated in an armed home invasion in which shots were fired and one of the occupants was injured. Petitioner was charged with several crimes beyond the jurisdiction of the Juvenile Court but sought a transfer of the criminal court's jurisdiction pursuant to Md. Code, Crim. Proc. Article § 4-202. Stressing the seriousness of the crimes and looking at petitioner's amenability to treatment in the juvenile system only in terms of his eligibility for possible programs, the court denied the transfer motion, whereupon petitioner entered a conditional guilty plea and was sentenced to 10 years, five without parole. The Court of Special Appeals affirmed. The Court of Appeals granted *certiorari* to clarify the meaning of amenability and its relationship to other statutory factors required by CP, § 4-202(d) to be considered by the court.

The Court of Appeals reversed. Section 4-202(d) requires the court to consider the defendant's age, physical and mental condition, amenability to treatment in a juvenile institution, program, or facility, the nature of the offense(s), and public safety. Amenability is the factor to which the other four are uniquely connected, and it means more than mere eligibility for a juvenile program. The court needs to determine what programs are available to the defendant in the juvenile and adult systems, whether the defendant would be willing to participate constructively in the juvenile program, and whether he or she would benefit from it in a way that would reduce the likelihood of recidivism better than anything available in the adult system. The controlling principle is the 1966 legislative declaration that the protection of the public is the ultimate goal of any juvenile delinquency program and that the program that is most effective in treating, educating, and rehabilitating juvenile offenders will best protect the public in the long run.

IN THE COURT OF APPEALS

OF MARYLAND

No. 51

September Term, 2020

HOWARD JIMMY DAVIS

v.

STATE OF MARYLAND

Barbera, C.J.
McDonald
Watts
Getty
Booth
Biran
Wilner, Alan M. (Senior Judge, Specially Assigned)

Opinion by Wilner, J.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Filed: July 12, 2021

On March 22, 2017, when he was just 16 years old, petitioner, along with two other young men, participated in an armed home invasion in Baltimore County. During that invasion, shots were fired and one of the family members was grazed with a bullet and battered with the butt of an assault rifle wielded by petitioner. For that activity, petitioner was charged in a 14-count indictment that included two counts of attempted first-degree murder, home invasion, first-degree assault, use of a firearm in the commission of a crime of violence, and reckless endangerment. Upon his arrest, he was detained in the Charles H. Hickey School, a detention facility operated by the Department of Juvenile Services (DJS).[1]

Because of petitioner's age and the nature of some of the offenses charged, the criminal division of the Circuit Court had exclusive original jurisdiction over petitioner, subject to a transfer of that jurisdiction to the Juvenile Court division of the Circuit Court pursuant to Md. Code, § 4-202 of the Criminal Procedure Article (CP). *See* Md. Code, §3-8A-03 of the Courts and Judicial Proceedings Article (CJP). On June 15, 2017, petitioner moved for such a transfer (commonly referred to as a "reverse waiver") and asked the court to order a study pursuant to CP § 4-202(e).[2]

---

[1] With exceptions not relevant here, Md. Code, § 4-202(h) of the Criminal Procedure Article requires that, pending a transfer determination, the court shall order the child to be held in a secure juvenile facility.

[2] CP § 4-202(e) permits the court, in making a determination whether to transfer jurisdiction, to order that a study be made concerning the child, the family of the child, the environment of the child, and other matters concerning the disposition of the case.

In anticipation of such a motion, four Reports were prepared for the court: a Reverse Waiver Report prepared by DJS case management specialists, a Mental Health Summary Form prepared by a Hickey mental health clinician, and a Detention Court Report and Detention Behavior Report prepared by Hickey case management specialists.

The Reverse Waiver Report, dated May 15, 2017, addressed the five statutory factors that the court would be required to consider in determining whether to transfer its jurisdiction, namely: (1) the age of the child; (2) the child's physical and mental condition; (3) the child's amenability to treatment in any institution, facility, or programs available to delinquents; (4) the nature of the offense(s); and (5) public safety. *See* CP § 4-202(d). The Report gave petitioner's age and details about his physical condition, including that he had a heart murmur and seasonal allergies and that he had suffered from asthma in the past but had not had an attack for five years. His mother reported that petitioner had become withdrawn and depressed recently and had been drinking and using unlawful drugs, which petitioner admitted.

Addressing petitioner's amenability to treatment, the Report recounted three prior contacts with DJS. The first occurred in May 2010 when, at the age of nine, he was charged with a fourth-degree burglary that was resolved at intake. In June 2014, when he was 13, he was charged with motor vehicle theft, malicious destruction of property, and breaking and entering, for which he was put on probation and ordered to pay $50 in restitution. In November 2015, while still on probation, he was charged again with motor vehicle theft and was placed on informal supervision. What actually occurred on those three occasions

2

is not at all clear; all that is reported is the fact that those events occurred. There is no indication whether any violence was involved.

As to the nature of the crime(s) that led to this case, the Report stated that the initial home invasion occurred at night while the family was sleeping. The family consisted of an adult male, his fiancé, and the fiancé's three children. The adult male heard a loud banging noise coming from the kitchen, went down to investigate, and saw one man in the kitchen and two others coming in through the sliding door. All three of the intruders were wearing masks, gloves, and dark clothing. He began fighting with the one already in the house, whereupon all three left.

The adult male then returned upstairs to get dressed and directed his fiancé to call 9-1-1 when he heard gunshots coming from the kitchen area. Several seconds later, one of the men kicked in the bedroom door and entered the room with an assault rifle. The fiancé locked herself in the bathroom. The adult male grabbed the barrel of the rifle; several more shots were fired as they struggled, one of which grazed the adult male. The struggle ended when the adult male was struck in the face with the butt of the rifle, knocking out some of his teeth. The three intruders then left the house. The fiancé's 11-year-old son saw two of the masked men, one of whom pointed a long black gun at him.

The Report recited that the three intruders were eventually arrested and that one of them told the police that petitioner was the one with the rifle and was the one who struck the adult male with it.

3

No recommendation was made in that Report.  The DJS case managers stated only that, if petitioner was transferred to juvenile jurisdiction, "evaluations would be requested to help determine appropriate services" and that "he will be eligible for behavior modification program in state and out of state."  They added that petitioner and his mother were willing "to participate in services offered by [DJS]."

The Mental Health Summary Form, dated May 10, 2017, deferred a primary diagnosis but stated a secondary diagnosis of "Cannabis Use Disorder-Moderate-in a controlled environment." The clinician stated that petitioner's presentation was always stable and alert and that his behavior was appropriate.  He said that petitioner "is open to individual therapy with mental health staff," that he had not been involved in any incidents since arriving at Hickey, had not been aggressive or disrespectful towards peers or staff, and was forthcoming about the events that led to his detention.

Regarding petitioner's participation in therapy sessions, the Report stated that he "was always willing to participate in individual and group therapy sessions to discuss his moods and behaviors."  He regularly attended community meetings, thoughtfully contributed to the group discussion, was "very amenable," cooperative, and tolerant of others.  He said that he wanted to return to high school, which had been interrupted by his detention, and to attend graduation with his family present.  His goal was to continue his training as a boxer and acquire employment as a carpenter.

Under the heading regarding "issues of concern and/or recent incidents that would impact treatment needs," the clinician wrote "N/A."  In addressing recommendations for

4

how to meet petitioner's treatment needs, Hickey's mental health clinician stated that, based on her interactions with petitioner, she believed that he "will benefit from individual counseling to address his poor decision making skill, substance use behaviors, and emotion regulation." More specifically, she stated that sessions should focus on (1) anger management to help with self-regulation that he will be able to implement in the community, (2) developing positive prosocial habits to replace negative, delinquent ones, and (3) dialectical behavior therapy to provide coping strategies to reduce youth's vulnerability, identifying emotions, and exploring opposite emotion actions.

Added to that list were family counseling to improve overall family support, group counseling to provide him an opportunity to engage with his peers in a structured setting and learn how to interact in a healthy prosocial manner, and continuing with his education (noting that his most recent grades were 71 in English, 81 in geometry, 73 in biology, 90 in career research development, and 81 in office system management).

Although a transfer hearing had been scheduled for June, petitioner requested a postponement in order to obtain a further evaluation. With no objection from the State, the hearing was postponed and did not take place until January 2018. In preparation for that hearing, at the request of defense counsel, a psychological evaluation was made of petitioner by Dr. Kristen Zygala, a clinical psychologist at Spring Grove State Hospital who did assessments for the Public Defender's Office, to assess his cognitive, emotional, and behavioral functioning and the potential risk for aggression in the future. As part of

her evaluation, Dr. Zygala reviewed the Reverse Waiver Report and the Mental Health Summary Form prepared by the Hickey clinicians.

Dr. Zygala's Report recited, in somewhat more detail, petitioner's family life, substance abuse, and legal history, which was consistent with the Hickey Reports, but she noted several traumatic events in petitioner's life not mentioned in the Hickey Reports – witnessing when he was seven or eight years old one man being shot and another stabbed, losing his grandmother, with whom he was very close, and his uncle and teenage cousin being shot to death, all when he was 11. Following those events, he entered a mentoring program through school.

Both as part of background information and her behavioral observations, Dr. Zygala also recounted that petitioner's mother had stated that petitioner had been a "wonderful child" who never gave her problems, but that he changed when he began dating a girl whom the mother regarded as a negative influence. The girl introduced him to Percocet, Xanax, and Suboxone and had fabricated an "elaborate lie" that she was pregnant with twins (to the point of sending him fake ultrasound pictures). She then told him that she had been raped by a family friend and had lost one of the babies. The mother said that petitioner's "mood changed significantly as he became withdrawn and depressed," with increased crying and drug use. That became important in calculating petitioner's risk factors later in her Report.

As part of the evaluation, petitioner underwent testing for cognitive functioning, achievement functioning, and emotional functioning. With one exception, he was

6

classified as "average." The one "below average" was for "word reading" on the Wide Range Achievement Test. From the Basic Assessment System for Children Self Report, Second Edition, that evaluates internalizing and externalizing difficulties, school problems, and personal adjustment, Dr. Zygala concluded that petitioner's responses reflected "a need for social approval and minimization of psychological distress."

Dr. Zygala then addressed counsel's request for a risk assessment. She used two risk assessment tools – the Chronic Violent Behavior Risk and Needs Assessment (CARE-2) and the Structured Assessment of Violence Risk in Youth (SAVRY). She described the CARE-2 as being divided into two sections – Risk Factors and Resiliency Factors. Under Risk Factors, she identified intermittent contact between petitioner and his father, substance abuse, association with delinquent peers, deficient problem-solving, and a history of truancy. Balancing that, she noted several Resiliency Factors – average IQ, supportive and nurturing caregiver (his mother), appropriate parental discipline, appropriate and achievable future goals, participation in positive activities, relates well to prosocial peers, and minimal conflicts with parents and siblings. Based on the scoring, she assessed petitioner's level of risk as "within the Low Risk range at this time," which means "not similar to youth with chronic assaultive behavior."

The SAVRY assessment measures four categories of risk factors – Historical Items, Social/Contextual Items, Individual Items, and Protective Factors. With respect to Historical Items, Dr. Zygala noted that petitioner's parents separated when he was six years old, they got along well, his mother has been the primary caregiver, and she had been

7

supportive. The father had become less involved in petitioner's life. There was no reported violence in the home, although petitioner had been exposed to neighborhood violence. Academically, petitioner had been an average student, but in the 10th grade his performance declined and truancy increased. Current test results reflected average verbal and nonverbal intellectual abilities, spelling, and math skills. He was achieving satisfactory grades at Hickey, and his goals included completing high school and attending college or trade school.

In terms of Social/Contextual Items, Dr. Zygala reported that petitioner got along well with peers and adults and with his parents and siblings but interacted with both negative and positive peers and, within the preceding year, his use of illegal substances had increased. She noted his prior legal involvement but also that a Hickey correctional officer had described him as "our best student." There were no concerns regarding petitioner's emotional functioning until the episode(s) with his former girlfriend who, it appears, was never pregnant and never raped. On a positive note, she found that he "exhibits a positive attitude, empathy for others, remorse for previous negative behaviors, compliance with the structure since being detained, and commitment to improving his future" and "does not have significant problems with inattention or anger management."

Given the absence of high-risk factors, Dr. Zygala placed petitioner in the Low Risk range for future serious violence. She opined:

> "Future aggression and violence does not seem consistent with his long-standing values, attitudes, and behavior. Importantly, although past behavior is an important aspect when assessing future violence, it is only one part of a

8

consolation [*sic*] of factors as reflected in the variety of items on the risk measures. [Petitioner's] potential for risk would further decrease if he is provided with the recommendations in this report."

Addressing then the transfer considerations, Dr. Zygala concluded that petitioner "would greatly benefit from involvement in the juvenile justice system where he can receive the necessary treatment for his academic and emotional struggles." She added that, given petitioner's strong desire to improve his situation, his significant remorse for previous negativity, and willingness to participate in recommended treatment, it appears that "[he] would greatly benefit from therapeutic and academic interventions as well as vocational training, substance abuse treatment, and mentoring in the juvenile system" and that that opportunity "is especially important because he has not been offered extensive services through DJS in the past." Although his alleged crime was "extremely concerning," she observed that it seemed out of character based on interviews and records. Dr. Zygala concluded her Report with 10 specific programs or therapies in the juvenile system from which petitioner could benefit.

In addition to the above, the Office of the Public Defender prepared a Transfer Report that, in part, recounted what was in the other Reports but in the context of the five factors set forth in CP § 4-202(d) required to be considered by the court. It listed the various programs, both in-State and out-of-State, that would be available to petitioner if he was transferred to the juvenile system.

One final document was before the court – a letter addressed to the judge from Kimberly Turner, on behalf of unCUFFED Ministries, a faith-based organization offering

9

life skills training, monitoring, and spiritual encouragement to detained youth. Ms. Turner recounted in the letter, and later in testimony at the transfer hearing, petitioner's participation in their program. She concluded that his commitment to receiving help, in her view, "is testimony to how amenable he is to treatment."

All of these Reports were in the record before the hearing judge and are in the record before us, although only Dr. Zygala's Report and Ms. Turner's letter were individually marked as exhibits. At the transfer hearing on January 23, 2018, the court acknowledged receiving and reading the other reports.[3] Dr. Zygala testified regarding her Report as did Jenna Conway, a licensed social worker, regarding the Transfer Report for the Public Defender's Office, which she had authored. With respect to available programs, Ms. Conway stated that there were programs available for petitioner, who was 17 at the time, but that DJS would have to decide which particular programs would be suitable for him once he was committed to the Department. She was clear that he had needs that could be addressed through placements made by DJS, even after he turned 18.

At the conclusion of argument by counsel, the court immediately announced its decision *extemporaneously* from the bench. Going through the five factors, it found that petitioner was 16 but less than a month away from his 17th birthday, that his physical and mental condition was good, and that his intelligence level was at least average. The crux of the issue for the court was a combination of the third, fourth, and fifth factors --

---

[3] There was some discussion at the hearing regarding the Reports from DJS and the Public Defender's Office. The court stated that it had read them.

amenability to treatment in the juvenile system, the nature of the crime, and public safety. For clarity in understanding the issues before us, we shall recite verbatim the court's findings and conclusions on those issues, but, for ease of reading, we shall break them into segments:

[1] "With regard to amenability, amenability to treatment in the juvenile system – but the report from Juvenile Services indicates that they would, they would need to conduct another evaluation and that he, he would be eligible for behavioral modification."

[2] "They don't mention that he could be held in a secure facility, although we know that and certainly that the experts testified to that."

[3] "The nature of this offense is horrific. It is probably the single most fact – concerning factor with regard to whether or not this young man should remain in the adult system. Everybody's very fortunate here today, that this did not result in a murder, because it very easily could have. But in any event, that it is a very serious, violent offense."

[4] "And I'm not persuaded, frankly, that the girlfriend is, is to blame here. But I have to say that, the presence of the girlfriend and her influence on this Defendant, that has been explained by the experts and, and counsel, frankly in my view does not favor transfer to the juvenile system, because, you know, there will be other girlfriends in the future and there will be other individuals in his life who will have an influence on him. And if those influences, influences can lead to behavior of this nature, that frankly, does not weigh in favor of transfer to the juvenile system."

[5] "In addition, while the expert that testified that kids are more impulsive is certainly true, and, and certainly most of that has to do with brain development, but it's important to note that, the vast majority of teenagers don't commit home invasion and attempted murder in spite of their impulsivity."

11

[6] "It's clear that when this young man is in custody, he does well, that he doesn't commit any offenses, that he's engaged in, in treatment, but when he's not in custody he has committed an offense, a very grave, violent offense. And in my view, he's a considerable threat to public safety."

[7] "Therefore, the Request to Transfer Jurisdiction to the Juvenile Court is denied. He'll remain in the adult system."

Following that ruling and facing trial in the criminal court, petitioner entered a conditional plea of guilty pursuant to Md. Rule 4-242(d) (and apparently Rule 4-243 as well), to two counts of first-degree assault and the one count of use of a firearm during the commission of a crime of violence, subject to (1) the State, upon a finding of guilt, dismissing the other counts and recommending a split sentence of actual incarceration with a cap of ten years, and (2) an understanding that the court had agreed to a cap of no more than ten years followed by a suspended portion of incarceration and a period of probation. The plea allowed petitioner to file an appeal limited to pretrial issues litigated in the Circuit Court, *i.e.*, the transfer motion.

The plea agreement was honored. Petitioner was sentenced to concurrent prison terms of 15 years, with all but ten suspended for the assault convictions and a concurrent term of five years, without parole, for the firearm offense. The sentencing judge recommended that petitioner be admitted to Patuxent Institution for inclusion in its youth program, but that did not occur.

Petitioner appealed his conviction to the Court of Special Appeals, arguing principally that the trial court did not properly consider the amenability-to-treatment factor

12

specified in CP § 4-202(d) but instead gave disproportionate weight to the nature of the crime and public safety. His complaint as to amenability was that the trial court took too narrow a view of what that meant and considered only whether he was eligible for programs that might be available upon a commitment to DJS and ignored whether he would be willing to participate in them and could benefit from them.

The Court of Special Appeals, in an unreported Opinion, found no merit in those arguments. It declared petitioner's attempt to distinguish between eligibility and actual amenability – willingness to participate – to be little more than a semantic argument insufficient to rebut the strong presumption that judges know the law and are not required to "spell out in words every thought and step of logic." Relying on some of its earlier decisions, the Court concluded that the five factors in CP § 4-202(d) need not be given equal weight and that it was permissible for a trial court, when the facts permit, to give predominant weight to the nature of the crime as it may affect public safety. On those conclusions, the Court of Special Appeals affirmed the Circuit Court's judgment.

We granted *certiorari* to clarify what is meant by "amenability" under CP § 4-202(d) and how that relates to the other four factors listed in that statute. These are matters of statutory construction – issues of law. We are not looking at whether the trial court abused its discretion in its ultimate determination, but whether it applied the proper legal standards in exercising its discretion.

DISCUSSION

13

The clear and overarching standard governing statutory construction is for the Court to "ascertain and effectuate the intention of the legislature." *75-80 Properties v. Rale, Inc.*, 470 Md. 598, 623 (2020). All, or at least most, of the other canons recounted in the case law are in the nature of guidelines leading to that ultimate end. If there is no ambiguity in the statutory language, we normally go no further and construe the statute as it is written, on the premise that the Legislature said what it meant and meant what it said. *See Id.*

We do not, however, analyze statutory language in a vacuum. Rather, it "must be viewed in the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute," and, in doing so, "we look to the statute's legislative history, case law, purpose, and overarching statutory scheme in aid of searching for the intention of the Legislature." *Hoang v. Lowery*, 469 Md. 95, 119 (2020).

That is what we must do here. As we indicated above, we took this case to clarify what is meant by "amenability" in CP § 4-202(d) and how that relates to the other factors in that section of the Code because neither of those things is presently clear, and that requires an examination of the legislative history and, with respect to the interrelationship of the five considerations, an analytical approach to what the General Assembly most likely had in mind.

**Statutory History**

Although there were precursors dating back at least to 1902, juvenile courts came formally to Maryland in 1943. It was then that the Legislature, by 1943 Md. Laws, Ch. 818, added to the jurisdiction of the Circuit Court of Baltimore City, which was one of the

14

several courts that constituted what was then known as the Supreme Bench of Baltimore City, jurisdiction in juvenile causes as set forth in the statute.[4] The law required the Supreme Bench to assign a judge to exercise that jurisdiction.[5]

Among other things, the law gave that judge "original, exclusive jurisdiction concerning any child who is dependent, delinquent, neglected, or feeble-minded." It added that, if the child was charged with the commission of an act that would amount to a misdemeanor or felony if committed by an adult, the judge, "after full investigation," may waive jurisdiction and order the child held for action under the regular procedure that would follow if the act had been committed by an adult. The jurisdiction over children charged with a crime had limits. The law defined "delinquent child" as excluding children whose conduct would constitute crimes punishable by death or life imprisonment if committed by an adult, and the court's jurisdiction was limited to children under 16.

Two years later, by 1945 Md. Laws, Ch. 797, the General Assembly extended that jurisdiction, although not all of the structure or procedure, to the Circuit Courts of the counties, except those in Allegany, Garrett, Prince George's, Montgomery, and Washington Counties. Those counties eventually were brought into the State system,

---

[4] This Court recounted the earlier history of juvenile proceedings in Maryland in *Matter of Anderson*, 272 Md. 85 (1974) and *Wiggins v. State*, 275 Md. 689 (1975).

[5] The judge so assigned was Charles E. Moylan, Sr., who remained the Juvenile Court judge in Baltimore City until he retired in 1967.

Montgomery being the last holdout until 1975.[6]  As in Baltimore City, the law excluded

from the definition of  "delinquent child" crimes punishable by death or life imprisonment

and permitted the Juvenile Court judge to waive jurisdiction "after full investigation," but

it gave those courts jurisdiction over children up to the age of 18.  In 1951, the Juvenile

Courts lost their jurisdiction over traffic offenses.

There was no provision in the State law for a "reverse waiver" – a transfer of

jurisdiction by the criminal court to the juvenile court where the alleged crime carried a

penalty of death or life imprisonment.  Nor were there any standards or guidelines for the

exercise of a waiver of the exclusive jurisdiction of the juvenile courts over all other

offenses, other than to make a "full investigation."

That became a Constitutional problem in 1966, when the Supreme Court struck

down the manner in which the District of Columbia Juvenile Court implemented an

identical provision in its juvenile causes statute.  *See Kent v. United States*, 383 U.S. 541

(1966).  In that case, Kent, a 16-year old, entered a woman's apartment, stole her wallet,

---

[6] Juvenile proceedings in Montgomery County were governed by a public local law
enacted by the General Assembly.  Unlike the "State" law, which placed juvenile
jurisdiction in the Circuit Courts, the Juvenile Court in Montgomery County was centered
first in the Peoples Court for that county and later, after 1971, in the District Court.  The
juvenile jurisdiction of that court was broader and many of the procedures differed as
well, which raised some equal protection issues. *See Matter of Trader*, 272 Md. 364
(1974).  The separate public local law for Montgomery County was repealed in 1975,
although some of the provisions in that law that were more favorable to juveniles were
incorporated into the State law. *See* 1975 Md. Laws, Ch. 554.  It was not until 2002 that
the Juvenile Court in Montgomery County was moved from the District Court to the
Circuit Court. *See* 2001 Md. Laws, Chapter 414.

and raped her. Concerned that the prosecutor would seek a waiver of Juvenile Court jurisdiction, the defense arranged for Kent to be examined by two psychiatrists and filed a motion for a hearing, asserting that, if given adequate treatment in a hospital under the aegis of the Juvenile Court, Kent would be a suitable subject for rehabilitation. Counsel also sought access to the social service file that had been accumulated by the court staff. The court ignored those requests, declined to hold a hearing, and summarily waived its jurisdiction.[7]

The Supreme Court reversed, holding that it was incumbent on the Juvenile Court to accompany its waiver order with a statement of the reasons or consideration supporting it. *Id.* at 561. The statement, it said, need not be a formal one but must demonstrate that a "full investigation" actually occurred and must "set forth the basis for the order with sufficient specificity to permit meaningful review." *Id.* at 561.

*Kent*, followed not too long afterward by *In re Gault*, 387 U.S. 1 (1967), touched off, both at a national level and within many of the States, a re-examination of the juvenile laws, with particular focus on what to do with youngsters who committed serious crimes. Maryland had already started on that examination, one that was much broader than due

---

[7] At the time of these events, there was an internal policy followed by the D.C. Juvenile Court regarding waivers and transfers to the criminal court, which the Supreme Court attached as an Appendix to its Opinion. *Kent*, 383 U.S. at 566. That policy was almost entirely concerned with the nature of the crime and public safety and did not include any consideration of whether the child could benefit from programs available in the juvenile system. The Supreme Court noted that that policy had later been rescinded prior to the filing of its Opinion. *Id.* at 546 n.4.

17

process requirements for transfer or waiver proceedings. The main issues were what the structure and jurisdiction of the juvenile courts should be, whether that jurisdiction should be uniform across the State, whether the court should be a division of the Circuit Court, as it was in most of the State, or could be part of a lower court, as it was in Montgomery County, and whether a new State agency should be created to develop and manage the facilities and programs that could serve as alternatives to what then existed.[8]

In 1965, a bill to lower the age jurisdiction of the juvenile courts in Anne Arundel and Baltimore Counties was passed but vetoed, following which the General Assembly, by Senate Joint Resolution 28 (Resolution No. 16), requested the Legislative Council – the precursor of the current Legislative Policy Committee – to initiate a study to determine the appropriate age limits for juvenile court jurisdiction and for the commitment of youthful offenders to institutions for the detention and training of juveniles, and to ascertain the most effective means of establishing adequate probation services to the juvenile courts.

Pursuant to that Joint Resolution, the Legislative Council created a Special Committee on Juvenile Courts chaired by Judge George B. Rasin, Jr., which conducted that study and made a Report of its findings and conclusions in January 1966 – three months before the Supreme Court's decision in *Kent* was filed. *See Report of the Legislative*

---

[8] In 1942, the Commission on the Judiciary Article of the Constitution – the same Commission chaired by Chief Judge Carroll T. Bond that recommended the restructuring of the Court of Appeals – recommended a Constitutional Amendment to create a Statewide Juvenile Court. Fifty years later, in 1992, a Governor's Task Force recommended a Constitutionally-created Statewide Family Court that would have jurisdiction over juvenile causes. Neither of those efforts bore fruit.

*Council Special Committee on Juvenile Courts*, January 1966 (occasionally referred to as the "Rasin Report"). The Report was comprehensive. It called attention to the fact that the jurisdictional age limit of the Juvenile Court in Baltimore City was 16, whereas in the counties it was 18 and recommended that it be uniform, settling on 17 as a compromise. It noted that there was no uniformity or comprehensive approach to the provision of services or for the detention and training facilities for juveniles and recommended that a new State agency – a Department of Juvenile Services – be created to take control of and improve those facilities and programs.[9]

It was in connection with the debate over the age limit that the question of "reverse waiver" by the criminal court first was raised. Those who recommended that the lower age limit – 16 – be retained proposed that the criminal court be able to waive a 16 or 17-year old offender to the Juvenile Court after deciding that he was "deserving of Juvenile Court treatment." The Special Committee opposed that suggestion, declaring that "[n]othing positive is accomplished by subjecting a child who will ultimately be treated as a juvenile to all the pre-trial aspects of the adult criminal procedure." *Report*, at 9. On the other hand,

---

[9] There were three other Gubernatorial Commissions operating at or about the same time – a Governor's Operating Economy Survey of Social Services that addressed Juvenile Services, a Commission to Study the Correctional System in Maryland, and a Commission for Children and Youth that had been in existence since 1956 and had previously been known as the Maryland Commission for the Prevention and Treatment of Juvenile Delinquency. *See 1965-66 Maryland Manual* at 200.

it said, "nothing is lost by giving the Juvenile Court original and exclusive jurisdiction over children through age 17 with the power to waive to the Criminal Court." *Id.*[10]

The age issue, and with it the waiver and reverse waiver issues, were not dealt with immediately. In its next (1966) Session, the General Assembly did, however, deal with the other major recommendation; it created the new Department of Juvenile Services and charged it with providing the Juvenile Courts with the best and most effective program of treatment, education, and rehabilitation for the youthful offenders who are in need of care, services, or treatment. In doing so, it declared its conviction that "the protection of the public is the ultimate goal of any program of controlling juvenile delinquency; and that the program which is most effective in treating, educating, and rehabilitating youthful offenders will be the most economical and will best protect the public over the years." 1966 Md. Laws, Ch. 126.

---

[10] The Special Committee recognized, and did not recommend any change to, the fact that delinquency did not include conduct that, if committed by an adult, would be subject to the death penalty or life imprisonment.

The concern about giving the criminal court original jurisdiction over children who commit violent felonies was expressed as well by a subsequent Commission on Juvenile Justice, chaired by Judge Robert Karwacki, created by Joint Resolution of the General Assembly in 1975. *See* Joint Resolution 50 (1975). In its 1977 Final Report, the Commission noted that "[i]n Maryland the greatest discrepancy with the national standards is that not all offenses committed by juveniles fall under original juvenile court jurisdiction." *See* Final Report, January 1, 1977 at 18. The concern of that Commission was that juveniles charged with the kinds of felonies over which the criminal court had original jurisdiction often spent up to six months in adult jails awaiting transfer hearings. That was resolved when the General Assembly required such children to be detained in a DJS facility.

The language enacting the five considerations for a waiver by a Juvenile Court was first drafted and considered by the General Assembly in 1968, in Senate Bill 608, as a new § 70-16 to what was then Article 26 of the Code – the Article dealing with courts. In a new section 594A added to Article 27 (the criminal code), that bill also would have permitted the criminal court to transfer its jurisdiction over a child under the age of 18 to the Juvenile Court "when such waiver is believed to be in the interests of the child and/or society." The five considerations for a Juvenile Court waiver were not included as part of § 594A, however. That bill did not pass in 1968 but was introduced and enacted in the 1969 Session as 1969 Md. Laws, Ch. 432.

The five factors required to be considered for Juvenile Court waivers did not become part of § 594A until 1975. *See* 1975 Md. Laws, Ch. 830. We may reasonably infer that they were taken from the language enacted in 1969 for Juvenile Court waivers. Previously, § 594A allowed the criminal court to transfer its jurisdiction over a child between the ages of 14 and 18 "if waiver is believed to be in the interests of the child and/or society." The title to the 1975 bill stated that the intent was to provide "certain standards and procedures to be used by the Criminal Court in waiving jurisdiction over persons not adults." In addition to stating the five factors to be considered, the law added that "for the purpose of making its determination, the court may request that a study concerning the child, his family, his environment, and other matters relevant to the disposition of the case be made," suggesting that the transfer determination be based on evidence and not speculation.

21

Because the General Assembly did not retain its Committee files when the language at issue first was enacted in 1969, we are unable to determine directly where it came from, other than a statement in the Minutes of the May 27, 1968 meeting of the Legislative Council Special Committee on Juvenile Causes that the [1968] bill was "drawn up" by "the Governor's Commission which was headed by Judge Rasin."[11] The five considerations themselves, in what are now CJP § 3-8A-06(e), CP § 4-202(d), and CP § 4-202.2 are generally consistent with, but not identical to, those recommended in revisions of other juvenile codes drafted after *Kent*.

In 1968, the National Conference of Commissioners on Uniform Laws drafted a proposed Uniform Juvenile Court Act that required a basic due process hearing on any petition to transfer Juvenile Court jurisdiction to the criminal court. It set as standards governing such a transfer whether the child was 16 or older and whether the court found reasonable grounds to believe that (1) the child committed the delinquent act, (2) the child "was not amenable to treatment or rehabilitation as a juvenile through available facilities," (3) the child was not committable to an institution for the mentally retarded or mentally ill,

---

[11] Despite inquiries of the State Library, the State Archives, and the Department of Legislative Services, we have been unable to locate such a "Governor's Commission headed by Judge Rasin." Judge Rasin chaired the Legislative Council Special Committee, and, given his well-documented interest in juvenile matters before, during, and after that period, we have little doubt that he probably did have a hand in drafting that language in Senate Bill 608, possibly for the Legislative Council Special Committee, but, other than the statement in the Minutes of the Special Committee meeting, we have no corroboration of it.

and (4) the interests of the community require that the child be placed under legal restraint to discipline. *See Uniform Juvenile Court Act (1968), § 34.*

In 1973, the American Bar Association became a co-sponsor with the Institute of Judicial Administration, a private nonprofit research organization located at New York University School of Law, of a Juvenile Justice Standards Project that ultimately led, in 1979, to the adoption of Juvenile Justice Standards Relating to Transfer Between Courts. Standard 2.2, dealing with waivers by the Juvenile Court, requires a finding by clear and convincing evidence that the juvenile "is not a proper person to be handled by the juvenile court," which must include determinations of the seriousness of the offense, the juvenile's prior record of adjudicated delinquencies, the "likely inefficacy" of dispositions available to the Juvenile Court as demonstrated by previous dispositions, and the appropriateness of the services and dispositional alternatives in the criminal justice system for dealing with the juvenile's problems and whether they are, in fact, available.

### Case Law

It was the Court of Special Appeals that first was tasked with ascertaining how the five considerations in our Code interrelated, in the context both of a waiver of the Juvenile Court's jurisdiction and a transfer of the criminal court's jurisdiction. That Court early and consistently concluded that not all of the factors need be resolved against the juvenile to justify a waiver or denial of transfer, that the court is not required "to make an arithmetic-type calculation as to the weight given by it to each factor," and that the waiver or transfer-court may emphasize the nature of the crime and public safety when the facts justify such

23

emphasis. *Hazell v. State*, 12 Md. App. 144, 155 (1971). *See also In re Bobby C.*, 48 Md. App. 249, 251 (1981).

The Court of Special Appeals added an important caveat to that proposition, however, in *Matter of Johnson*, 17 Md. App. 705, 712 (1973), where it reversed a transfer to the criminal court, concluding:

> "We think it is apparent that the hearing judge was unduly influenced by the 'nature of the offense' to the extent that the amenability of the appellant to rehabilitation was cast aside and not considered, or, if considered, was not afforded its proper weight. The mere statement that the five legislative factors were considered by the hearing judge does not divest this Court of its right to determine whether *vel non* those factors were actually considered and properly weighed in relation to each other and relative to the legislative purpose embodied in [what was then] § 70 [now CP § 4-202(d)]."

In *Gaines v. State*, 201 Md. App. 1 (2011), also a reverse waiver case, the Court distinguished *Johnson* on its facts and found no error or abuse of discretion in the denial of a transfer motion based largely on the nature of the crime and public safety. The defendant was charged with an armed robbery of a fast-food restaurant and its customers in which an employee was pistol-whipped and the defendant fled in a stolen car. Although the Court's Opinion did not recount Gaines's previous criminal history, there was a reference to a "boat load of dismissals" which the hearing judge speculated "just seems to come from Baltimore City" and the fact that Gaines had been expelled from school. The trial court recited and weighed the five considerations but declared that it was "overwhelmed by the brazen and callous nature of the crime." *Id.* at 19.

24

The *Gaines* Court did point out two variations in language in the factors as stated in CJP § 3-8A-06 and CP § 4-202(d). In the waiver statute, CJP § 3-8A-06(e)(4), the court must weigh "[t]he nature of the offense *and the child's alleged participation in it*." In the reverse waiver statute, CP § 4-202(d), the italicized language is missing. In the waiver statute, CJP § 3-8A-06(d)(2), the court is to presume that the child committed the alleged delinquent act. That is not included in the reverse waiver statute. In the end, the appellate court rejected Gaines's complaint that the trial court abused its discretion by placing too much emphasis on the actual criminal behavior and affirmed the criminal court judgment.

What the case law so far reveals is that, although there are five separately stated factors that must be considered, both in a waiver of Juvenile Court jurisdiction and in a transfer of criminal court jurisdiction, the cases tend to turn on a weighing of the child's amenability to available programs in the juvenile system against either the brutal nature of the crime already committed or an inference drawn from it that the child will remain a danger to public safety, as though they were polar opposites. The court's ultimate decision, regarded as a discretionary one, has hinged on which of them the court finds predominates, which, increasingly, has been public safety.

Professor Christopher Slobogin, now of Vanderbilt University, has noted that trend. Observing that, from its inception, the Juvenile Court was "meant to focus on the rehabilitative potential of children," and, "on that premise, the central inquiry in a delinquency proceeding should be whether the child is amenable to treatment," the "vagueness of the concept, the inadequacy of treatment programs, and the influence of

25

retributive and incapacitative agendas have helped push it into the background." *Treating Kids Right: Deconstructing and Reconstructing the Amenability to Treatment Concept*, Christopher Slobogin, 10 J. Contemp. Legal Issues 299 (1999).[12]

## Analysis

We do not think that regarding amenability to treatment and public safety as polar opposites is the analytical method contemplated by the General Assembly, especially when the factor of amenability is construed as we believe the General Assembly intended and as it should be construed.

## What is Meant by Amenability

We begin with CJP § 3-8A-02(a), which states among the purposes of the subtitle that governs delinquency proceedings as being, in relevant part, to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; to provide for a program of treatment, training, and

---

[12] That certainly has been the trend in Maryland in terms of shrinking the jurisdiction of the juvenile courts. *See* (1) 1982 Md. Laws, Ch. 468 prohibiting the criminal court from transferring a case to the Juvenile Court if (i) the child had previously been reverse waived and was adjudicated delinquent, (ii) the child was convicted in an unrelated case that was excluded from Juvenile Court jurisdiction, or (iii) the child is charged with first-degree murder and was 16 or 17 at the time the offense was committed; (2) 1986 Md. Laws, Ch. 790, excluding from the original jurisdiction of the Juvenile Court a child charged with certain handgun offenses; and (3) 1994 Md. Laws. Ch. 641, excluding from Juvenile Court original jurisdiction 17 other offenses. *See* CJP § 3-8A-03(d) for the entire list of exclusions. Those are legislative judgments that do not concern us in this case, other than to note that most of those cases are subject to reverse waiver and thus subject to the discretionary weighing process under CP § 4-202(d) rather than CJP § 3-8A-06.

rehabilitation consistent with the child's best interests and the protection of the public interest; to conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety; and to provide to children in State care and custody a safe, humane, and caring environment, access to required services, and provide judicial procedures for carrying out the provisions of the subtitle. Subsection (b) requires that the subtitle be liberally construed to effectuate those purposes.

The considerations for waiver of Juvenile Court jurisdiction set forth in CJP § 3-8A-06 most clearly, and the near identical considerations for transfer of criminal court jurisdiction set forth in CP § 4-202(d) implicitly, must be construed in light of those purposes. That is most important in defining the concept of amenability. Of the five considerations in that section, only "amenability to treatment in any institution, facility, or program available to delinquents" is not self-defining. "Amenability" is not defined in the Code or in the DJS regulations.

When searching for the meaning of a statutory word, we often turn first to recognized dictionaries, which sometimes, but not always, are helpful. *See Montgomery County v. Deibler*, 423 Md. 54, 67 (2011). Black's Law Dictionary (11th ed. 2019) defines "amenable" as "acknowledging authority; ready and willing to submit" giving as an example "suitable for a particular type of treatment." The Merriam-Webster Dictionary defines the term as "ready or willing to answer, act, agree, or yield; open to influence, persuasion, or advice; agreeable; submissive; tractable" and "capable of or agreeable to

being tested, tried, analyzed, etc." Webster's New Universal Unabridged Dictionary (2nd ed. 1979) defines the word as including "willing to follow advice; open to suggestion; submissive."

Petitioner's complaint here is that, in denying his motion to transfer, the court looked at amenability to treatment solely in terms of whether he was eligible for programs available in the juvenile system and gave little or no consideration to whether he was willing to participate in those programs and whether he could benefit from them. The court did mention amenability but made only two exceedingly brief comments regarding it: one, that DJS indicated it would need to conduct another evaluation; and two, that petitioner would be eligible for behavioral modification. Notwithstanding the wealth of evidence regarding petitioner's amenability to treatment in the juvenile system contained in the Reports presented to the court and in the testimony of Dr. Zygala and Ms. Conway, that was it.

Assessing amenability to treatment requires more than that. To determine amenability to treatment, the court needs to know what treatment is or will be available to meet the child's needs and address the child's problems. Presumably, the State, through DJS or other entities, would have that information as part of a waiver/transfer study, even if it is in the form of options that may depend on further evaluations and the child's progress. The court needs to determine whether those programs would, in fact, be available to the child, for if not, as to that child, they do not exist. Evidence that there were, in fact,

28

DJS programs that could address petitioner's needs and problems was presented to the court in considerable detail and was not contradicted.

With an eye both toward the welfare of the child and public safety, which, in our view are inter-related, the court needs to make an assessment of whether it is likely that the child would benefit from an available DJS program better than he or she would from anything likely to be available in the adult system and whether that would reduce the likelihood of recidivism and make the child a more productive law-abiding person. Those are quality assessments that can be based on evidence of how those programs or kinds of programs have worked with other children, from actual data or from reliable studies.

We do not pull these considerations out of thin air. As Professor Slobogin has observed:

> "The law's foremost concern in determining amenability is whether intervention will reduce or eliminate recidivism of the offender. The *Kent* transfer criteria refer to '[t]he prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile . . . by the use of procedures, services and facilities currently available to the Juvenile Court.'"

*Treating Kids Right, supra*, at 303, citing *Kent*, 383 U.S. at 567.

### Interrelationship Among the Factors

The five considerations are not in competition with one another. They all must be considered but they are necessarily interrelated and, analytically, they all converge on amenability to treatment. The age of the child, for example, may, in some circumstances, be critical in determining whether he or she is legally eligible for waiver or transfer, but

29

beyond that, in determining whether jurisdiction *should* be waived or transferred has relevance only in connection with public safety and amenability to treatment, as we have defined it. Whether the child has a mental or physical condition also has relevance only to amenability and possibly public safety; the court must determine, from evidence, what the condition is and whether there is a DJS program that can deal with it better than anything in the adult correctional system. The nature of the crime: if the child is eligible for waiver or transfer, the crime is likely to be either serious or repetitive, which, like age and physical or mental condition, may be relevant to amenability to treatment or public safety and must be considered in that context but has no independent significance.

As we have noted, public safety has come to be regarded as an independent and often overarching and determinative consideration, as it was in this case. Like the other factors, however, its significance lies in its relationship with amenability to treatment. The court may correctly determine that, given everything else, the child currently represents a danger to public safety, but, in the context of a waiver or transfer proceeding, that is not determinative. The issue is not whether the child will be released but rather whether he or she should be dealt with in the juvenile or the adult system, and ultimately, that invokes the amenability to treatment in the juvenile system. Is there a program that can provide immediate safety to the public and make recidivism less likely? If so, absent some other circumstance, the child should be transferred to or remain in the juvenile system. We harken back to the legislative declaration in Chapter 126 of the 1966 laws, *see supra*, that "protection of the public is the ultimate goal of any program of controlling juvenile

30

delinquency" and "that *the program which is most effective in treating, educating, and rehabilitating youthful offenders will be the most economical and will best protect the public over the years*." (Emphasis added).

The converse also is true. If DJS does not have a program competent to address the issues defined that is available to the child and from which the child likely can benefit in a way that will produce better results than anything in the adult system and significantly lessen his danger to the public, a reverse waiver request should be denied, because there is then no point in sending the case, over which the General Assembly has given the criminal court exclusive original jurisdiction, to the Juvenile Court.

**This Case**

It is evident from the court's remarks, quoted above, that it did not consider amenability – the ultimate determinative factor that takes into account each of the other four factors – properly, and we shall have to direct that the case be remanded for a new transfer hearing to apply the five considerations, which are repeated in CP § 4-202.2(b), in accordance with this Opinion. Because more than three years has elapsed since the January 2018 hearing, however, the current situation is very different from what it was earlier. Petitioner is now 20, not 17. The jurisdiction of the Juvenile Court over him will end in less than a year. His physical and mental condition may have changed, and whether he remains a danger to public safety will have to be judged as of now. What has he learned from three years in prison?

31

At oral argument in this Court, petitioner conceded that he committed the offenses that brought him before the trial court and did not intend to seek a withdrawal of his guilty plea in that court or an adjudicatory hearing in the Juvenile Court. All he seeks now is to have the case transferred to the Juvenile Court for a disposition hearing. We shall vacate the judgment of the Court of Special Appeals and remand the case to that Court for an Order remanding the case to the Circuit Court for a new hearing on petitioner's transfer motion, applying the principles and conclusions set forth in this Opinion. If the court denies the motion, the judgment of the criminal court shall stand. If the court grants the transfer motion, it shall vacate the current judgment and transfer the case for a disposition hearing in the Juvenile Court, which must be guided by the findings that led the criminal court to transfer its jurisdiction. *See* CP § 4-202.2(b) and (e).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN CONFORMANCE WITH THIS OPINION; COSTS TO BE PAID BY BALTIMORE COUNTY.**

32