*John Paul Sexton v. State of Maryland*, No. 1324, September Term 2022. Opinion by Albright, J.

**Appeals – Appealability of Orders Generally**

A ruling on a motion is appealable if it conclusively settles a movant's rights in the subject matter and is not the result of the exercise of the court's discretion but rather an incorrect legal determination that the court lacked authority to grant the motion.

**Criminal Procedure – Juvenile Restoration Act**

Under the Juvenile Restoration Act, the Court may reduce the duration of a sentence for an individual who was convicted as an adult for an offense committed as a minor and sentenced before October 1, 2021, if the individual has been imprisoned for at least 20 years for the offense. Md. Code, Crim. Proc. § 8-110(a). To do so, the court must determine that (1) the individual is not a danger to the public; and (2) the interests of justice will be better served by the reduced sentence. Md. Code, Crim. Proc. § 8-110(c).

**Criminal Procedure – Juvenile Restoration Act**

Under the Juvenile Restoration Act, regardless of whether the Court decides to grant or deny a motion to reduce the duration of a sentence, the Court must issue its decision in writing and address the factors listed in subsection 8-110(d) of the Criminal Procedure Article. The fact that a sentence is parole-eligible does not impair the right to be considered for a sentence reduction, and the Court does not have discretion to defer to the Parole Commission. *See* Md. Code, Crim. Proc. § 8-110(d) & (e).

Circuit Court for Frederick County
Case No. 00009893

_____

JOHN PAUL SEXTON

v.

STATE OF MARYLAND

_____

Friedman,
Albright,
Meredith, Timothy E.
 (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Albright, J.

_____

Filed: July 27, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

\* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This appeal arises out of a motion for reduction of sentence filed in the Circuit Court for Frederick County by John Paul Sexton, appellant. After a hearing on September 23, 2022, the circuit court denied the motion, explaining that the question of Mr. Sexton's release was a matter for the parole board. This timely appeal followed.

The sole issue presented for our consideration is whether the circuit court applied the wrong legal standard and abused its discretion in denying the motion. For the reasons set forth below, we shall vacate the judgment of the circuit court.

## BACKGROUND

### A. The Underlying Crime

In 1988, Mr. Sexton, a minor, was charged as an adult with various crimes arising out of the shooting death of Marc Uher. The shooting occurred on October 26, 1988, the evening before Mr. Sexton's seventeenth birthday. A jury trial was held in October 1989. The record showed that Mr. Sexton "shot and killed Marc Uher, his friend, in the course of a robbery." *Sexton v. State*, No. 681, Sept. Term 1990 at *1 (per curiam) (filed April 15, 1991). The shooting occurred when Mr. Sexton was accompanying Mr. Uher, who was delivering receipts from a gasoline station to the station owner. *Id.* at *2. At trial, Mr. Sexton testified on his own behalf that he "grabbed one of the money sacks and was getting out of the car when the victim suddenly accelerated the car causing the gun to strike the seat and accidentally discharge." *Id.* "Other evidence indicated that the victim was shot in the right temple from a distance of approximately six inches." *Id.*

1

Mr. Sexton was convicted of first-degree premeditated murder, first-degree felony murder, robbery with a dangerous weapon, robbery, three counts of use of a handgun in the commission of a crime of violence, and theft. On December 13, 1989, he was sentenced to life in prison for first-degree premeditated murder, a consecutive twenty years for one of the use of a handgun counts, and another consecutive twenty years for robbery with a dangerous weapon. The remaining counts merged for sentencing purposes. The judgment was affirmed on appeal to this Court. *Sexton*, No. 681, *supra*. The Supreme Court of Maryland (at the time named the Court of Appeals of Maryland)[1] denied Mr. Sexton's petition for writ of certiorari.

**B. Motion for Reduction of Sentence Pursuant to the Juvenile Restoration Act**

On May 27, 2022, more than 32 years after he was sentenced, Mr. Sexton, who remains incarcerated, filed in the circuit court a motion for reduction of sentence pursuant to Section 8-110 of the Criminal Procedure Article. *See* Md. Code, Crim. Proc. ("CP") § 8-110 (2001, 2018 Repl. Vol., 2022 Supp.). That section of the Maryland Code is part of what is known as the Juvenile Restoration Act ("JUVRA").[2] Chapter 61, Laws of Maryland 2021. Enacted in 2021, and effective October 1, 2021, JUVRA made three

---

[1] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. See, also, Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland….").

[2] Other provisions of JUVRA are set forth in CP § 6-235.

significant changes to Maryland's sentencing practices for juvenile offenders convicted as adults. "Specifically, it gave sentencing courts discretion to impose less than the minimum required by law, prospectively banned sentences of life without the possibility of parole, and authorized offenders sentenced before October 1, 2021 who have spent more than 20 years in prison to file a motion to reduce their remaining sentence." *Malvo v. State*, 481 Md. 72, 85 (2022) (citing CP §§ 6-235, 8-110). Only the final provision is at issue here. It applies "only to an individual who: (1) was convicted as an adult for an offense committed when the individual was a minor; (2) was sentenced for the offense before October 1, 2021; and (3) has been imprisoned for at least 20 years for the offense." CP § 8-110(a).

JUVRA specifies that the court may reduce the duration of a sentence if it determines that "(1) the individual is not a danger to the public; and (2) the interests of justice will be better served by a reduced sentence." CP § 8-110(c). The court is required to consider factors set forth in subsection (d), which provides:

> (d) A court shall consider the following factors when determining whether to reduce the duration of a sentence under this section:
> (1) the individual's age at the time of the offense;
> (2) the nature of the offense and the history and characteristics of the individual;
> (3) whether the individual has substantially complied with the rules of the institution in which the individual has been confined;
> (4) whether the individual has completed an educational, vocational, or other program;
> (5) whether the individual has demonstrated maturity, rehabilitation, and fitness to reenter society sufficient to justify a sentence reduction;
> (6) any statement offered by a victim or a victim's representative;
> (7) any report of a physical, mental, or behavioral examination of the individual conducted by a health professional;

(8) the individual's family and community circumstances at the time of the offense, including any history of trauma, abuse, or involvement in the child welfare system;
(9) the extent of the individual's role in the offense and whether and to what extent an adult was involved in the offense;
(10) the diminished culpability of a juvenile as compared to an adult, including an inability to fully appreciate risks and consequences; and
(11) any other factor the court deems relevant.

CP § 8-110(d).

The statute is silent as to the weight to be given to each factor, and Maryland's appellate courts have not addressed that issue. Regardless of whether the court decides to grant or deny the motion to reduce the duration of a sentence, it must issue its decision in writing and address the factors listed in subsection 8-110(d). *See* CP § 8-110(e)(1). If the motion is denied or granted in part, the individual may file another motion after three years. CP § 8-110(f)(1). A third and final motion may be filed after an additional three-year waiting period. *Id.* JUVRA does not affect the individual's opportunity to seek parole.

In the instant case, there is no dispute that Mr. Sexton was eligible to file his motion to reduce the duration of his sentence pursuant to CP § 8-110, but the State opposed any reduction of his sentence.

4

**C. JUVRA Hearing**

A hearing on the motion for reduction of sentence was held on September 23, 2022. The judge advised the parties that she had read the transcript of Mr. Sexton's trial and reviewed all of the documents and exhibits filed by both Mr. Sexton and the State.[3]

Counsel for Mr. Sexton argued that the court should reduce Mr. Sexton's sentence to time served or set a future release date. In support of that request, counsel explained Mr. Sexton's experience with addiction as a teenager, stating:

> John Paul Sexton deserves our mercy. John was a latchkey kid growing up. His parents loved him dearly but worked long hours and instilled in him a great pride in doing work, and doing work well.
>
> That work ethic in doing the job, started at 13 for John when he started working at a sanitation plant. The summer he was 16, he could work full time and over the table. So he suddenly had the disposable income of an adult with an adolescent mindset.
>
> The job was long, had labor intensive hours, and he became friends with his coworkers, adult men. They partied, so Mr. Sexton partied as well.

---

[3] Those documents included the following attachments to Mr. Sexton's motion for reduction of sentence: pages from Mr. Sexton's 1989 Pre-Sentence Investigation; his 1991 high school diploma; a 1995 Dean's List certificate from Coppin State College; a certificate for completing 1,920 hours as a computer clerk for Maryland Correctional Enterprises in 2007; a certificate for 9 years of experience in clerical and computer graphic arts, welder, and tag production while employed at Maryland Correctional Enterprises; a 2016 positive reference letter from the veterinarian for the puppies trained by America's Vet Dogs; a positive letter of reference from Sgt. Vinson, a liaison for America's Vet Dogs; a 2016 positive reference letter from Rebecca Offutt, a Case Management Specialist at the Maryland Correctional Institute; letters of recognition and certificates for Mr. Sexton's work in the Youth Challenge Program; a 2016 letter of acknowledgement for Mr. Sexton's work with the Lifer's Conference; 2008 Maryland Parole Commission recommendation/decision; page 866 from the trial transcript; and a 2021 letter of support from Minister Ila A. Thompson. The trial court also considered documents provided prior to the hearing which included letters of support from a corrections officer, Mr. Sexton's older brother, and Mr. Sexton's mother.

And by the end of that summer, he had a full-fledged addiction to crack cocaine.

When school started, he could work less and less, and the disposable income he had to feed his addiction dried up. Mr. Sexton was playing an adult with the training, experience, and mindset of an adolescent. He could not appreciate the stakes.

To feed his addiction, Mr. Sexton started resorting to things he's not proud of. Theft, it snowballed to robbery and murder. Adolescence and addiction strained John's decision and actions 33 years ago.

Counsel highlighted Mr. Sexton's achievements while incarcerated. Mr. Sexton "spent the first two weeks" in prison in solitary confinement, "detoxing, withdrawing, sobering up to the reality that he had taken a friend's life." After being released to the general population, he had only two infractions in all his years of incarceration, both of which occurred in the early years of his prison sentence. Mr. Sexton earned his GED within his first two years of incarceration, took college courses when permitted, and made the dean's list. He also joined a victim's rights organization that hosted an annual victim's rights week, arranged for speakers, and engaged with victims. From 2014 to 2019, Mr. Sexton worked as a trainer for America's Vet Dogs, a nonprofit organization that provided service dogs for veterans and first responders. In all, Mr. Sexton trained ten dogs, five from puppies. Counsel played for the court a recording of a local news story about America's Vet Dogs that included Mr. Sexton, who highlighted some of his work with a dog named Raven, the fourth dog he trained.

The State argued that regardless of Mr. Sexton's achievements while incarcerated, his motion should be denied. The State presented the court with victim impact statements shared with the State's Attorney's Office after Mr. Sexton's motion was filed, including

one from Marc Uher's brother, Paul. Among other things, Paul Uher stated that Mr. Sexton had not apologized or made "any attempt at amends to" his family. Marc Uher's father, who was about 81 years old, found it too difficult emotionally to participate in the hearing.

The State argued that Mr. Sexton's motion should be denied because of the premeditated nature of the offense, the senselessness of the crime, Mr. Sexton's lack of remorse, and the level of harm and loss caused by Mr. Sexton's crimes. In support of those arguments, counsel noted that evidence presented at trial showed that for a couple of days leading up to the shooting, Mr. Sexton had in his possession a gun that belonged to his brother. Mr. Sexton used his "friendship to con Marc[4] into telling him how the [gas] station was run, how much money they got, what they did with the money in the evenings, where they took it, and how it was taken away." On the day before the shooting, Mr. Sexton attempted to flag down another employee of the gas station as he was driving the money to the owner, but that employee did not stop. On the day of the shooting, Mr. Sexton, with a gun in his possession, spent all evening at the gas station with Marc. According to the State, Mr. Sexton did not commit the murder for money but instead to cover up his crime and to escape because he knew he could not get away with the money without killing his friend.

---

[4] At times in the circuit court, the State and Mr. Sexton referred to Mr. Marc Uher as "Marc." We do so as well in order to be accurate. We mean no disrespect in doing so.

The State asserted that Mr. Sexton had failed to show remorse. The State noted that after Mr. Sexton shot Mr. Uher, he pushed him into the passenger seat and then drove to the side of some railroad tracks where he dumped Mr. Uher's body. For three and a half days thereafter, Mr. Sexton interacted with Mr. Uher's family and friends, went to Mr. Uher's house, and purposely directed groups looking for Mr. Uher not to go to the place where he had dumped the body. The day after the shooting, Mr. Sexton told a Sheriff that he had been with Mr. Uher at the gas station until he got off work. Mr. Uher then drove him to a location where Mr. Sexton had planned to meet a girl and then drove away. Although Mr. Sexton provided a name for the girl he said he was with, no such person was ever found.

The State also pointed to the transcript of an interview of Mr. Sexton conducted by the police after he had been arrested and which had been admitted in evidence at the murder trial. In that interview, Mr. Sexton gave different versions of what occurred. He admitted that he took the money and ran off and claimed that Mr. Uher tried to run after him for a bit. Mr. Sexton denied that the money was for drugs. Later, Mr. Sexton admitted that he had a gun and said it went off accidentally while getting out of the car. Because he did not know what to do, he jumped back in the car, pushed Mr. Uher to the other side of the car, and drove around for a bit before dumping his body at the railroad tracks. After dumping Mr. Uher's body, Mr. Sexton drove to Frederick. He opened the bags of money, bought some crack cocaine, and then hung out in his car. Later, he met up with friends and family to look for Mr. Uher.

At trial, Mr. Sexton stuck "with the story that the gun accidentally went off," but pending sentencing, Mr. Sexton wrote a letter to a Supreme Court of Maryland judge claiming that someone else shot Mr. Uher and that he had been framed. Mr. Sexton asserted that he knew "who did it but he needs somebody he could talk to in confidence." According to the State, the statements in the letter were in contrast to statements in Mr. Sexton's psychological, drug, and alcohol evaluation prepared in anticipation of sentencing, where Mr. Sexton maintained the shooting was accidental. The State highlighted that "testimony throughout the trial show[ed] that the gun was placed within inches of Marc's head."

For all these reasons, the State argued that while Mr. Sexton might be a reformed prisoner, he was not a reformed person, that it did "not have trust that [Mr. Sexton] will not reoffend in some way," and that he was not ready to be released back into society. According to the State, none of the justifications for passing JUVRA applied to Mr. Sexton except for his "age and the, probably biological definition of what his brain was at that time." The State noted that Mr. Sexton was not influenced by an adult when committing the crimes, that he did not have a mental health diagnosis, and that he did not have a history of abuse. Moreover, there was no evidence to suggest that Mr. Sexton acted impulsively or that he lacked impulse control.

Mr. Sexton's attorney challenged the State's claim that Mr. Sexton did not have remorse. She stated that Mr. Sexton had made efforts to reach out to the Uher family to apologize and "have some sort of restorative justice conversation," but he was not able to

9

get in touch with the family or had been advised by counsel not to do that. She also noted that Mr. Sexton was not disputing any of the facts about the crimes he committed and that the State "created a false dichotomy between [the victim] and Mr. Sexton." She argued that this was in contrast to the purpose of JUVRA, which "was to override the executive retributive way that we treated children," and that the "facts of the incident" was only one of eleven factors the court was required to consider. Counsel for Mr. Sexton also argued that Mr. Sexton's actions after the incident were "adolescent" and "immature" and that "trying to lie their way out of an issue" is an "adolescent's way of responding."

Mr. Sexton testified at the motions hearing. He did not know that Marc's mother had died and had hoped Marc's father would be at the hearing because he wanted "to tell them how sorry [he was] for all the pain and all the suffering that [he] caused them because of what [he had] done to Marc." He explained that Department of Public Safety and Correctional Services protocols prohibited him from contacting the victim's family. Nevertheless, he tried to have attorneys, family members, and a mediator reach out to the Uher family but was unsuccessful. He expressed remorse, stating, in part:

> You can address me. You can ask me whatever questions that you would want to. My behavior was wretched and deplorable. There's no excusing what I did. There's no causation for what I did. And I know that I've hurt you, and I've … hurt the [Uhers] more than anybody can ever imagine.

Later, Mr. Sexton said:

> I often think about Marc, a lot of times, and what has been lost. Not just in terms of his character, but what he would have produced. He might have came up with the cure for cancer. But we'll never know because of me.

And I am remorseful for that. I am ashamed of that. And I am sorry for that.

Mr. Sexton noted that he had not pursued any collateral attacks or post-conviction proceedings and stated, "I haven't been trying to skirt my responsibilities and taking responsibility for my actions." He explained that he used his time in prison as "an atonement journey of the highest order," sought "to do positive, not just for himself[,]" and tried "to help people" and "do better things for this world." He claimed he "can't stand drugs today" and had not "done a drug" since the crime.

Mr. Sexton spoke about his work in prison planning victims' rights events, training service dogs, engaging with "wayward youth," and teaching music classes. He rejected the State's suggestion that he had not been rehabilitated or that he would "always be the same horrible person" that he was when he was "16 and strung out on drugs." Mr. Sexton claimed there were "a lot of things that [he] can contribute to society, rather than wasting away somewhere in a dungeon." He also suggested that he was in need of medical treatment, although no specific evidence on that point was presented.

### D. Court's Findings on the Required Factors

At the conclusion of the hearing, the court took a recess to review written victim impact statements. When court reconvened, the judge addressed the factors set forth in CP § 8-110(d). As to the first four factors, the court found as follows:

> First factor that the Court has to consider is what was the individual's age at the time of the offense. At the time of the offense, Mr. Sexton was 16. However, I note it was very shortly before his 17th birthday. But at the time, he was 16 years old.

11

This conviction was – is for first degree premeditated murder, as well as armed robbery and use of a handgun in a crime of violence. There were also some additional offenses that went to the jury that were consumed in the convictions for first degree murder, premeditated murder, as well as the robbery and the handgun convictions.

Mr. Sexton is the actor, is the sole principal in this offense. This was not a codefendant case. And again, there were no other individuals that were involved in the commission of this offense, other than Mr. Sexton.

The Court next has to consider whether the individual has complied with the institution – the rules of the institution in which he has been confined. And clearly, from the record before me, Mr. Sexton has complied with the rules of the institution as noted in the parole commission notes that he has been – his record in the division has been exemplary.

He's done very, very well. He has completed his educational requirements and has fulfilled and enhanced other programs available through the Division of Correction. So he has been using his time appropriately and productively during his period of incarceration.

As to the fifth required factor, the court determined that Mr. Sexton had "demonstrated maturity and rehabilitation" and that there was "no evidence indicating that he has had any behavior in the prison that would adversely affect his being released in society." The court deferred its finding on whether a sentence reduction was justified until after discussing "other things."

The court addressed required factors six through ten as follows:

I do note, I've received and read statements by the victims and the victims' representatives that the pain and the hurt from this offense continues to this day, 34 years later. There is – Mr. Sexton has referenced he has some physical concerns. There is not any evidence of any mental behavioral concerns for Mr. Sexton at the present time, although there are health concerns.

Mr. Sexton's family and community circumstances at the time of the offense, which include any history of trauma, abuse, or other involvement in the child welfare system. Although clearly Mr. Sexton was not in the child welfare system, there's no significant history of trauma.

12

I did have the opportunity to review the psychological evaluation that was completed after the conviction, and prior to the sentencing, which indicated there was some family issues and Mr. Sexton was not residing at home for the few days shortly before the murder in this case.

And that there was some – there were family issues going on at that time, and that that was known to the Court at the time of the initial sentencing in this case, that there were some factors there, but not a significant fact.

The next is the individual's role in the offense and whether and the extent to which an adult was involved in this offense. As I indicated earlier, there were no other individuals involved and that Mr. Sexton was the sole actor in this, in this crime – crimes.

Factor ten talks about the diminished culpability of a juvenile as compared to an adult, including an inability to fully appreciate the risks and consequences. That is a factor that the Court generally takes notice of, is there are studies that indicate that, of course, that juvenile brains develop much more slowly and that as a consequence, it is kind of an assumption that the individual can't appreciate the risks and consequences.

I don't have any definitive study from the time, or actually looking back at the time, that indicates what Mr. Sexton's culpability determination was at that time. There's just no evidence of that.

The eleventh required factor is "any other factor the court deems relevant." Under that factor, the court considered two cases, *Harris v. State*, 479 Md. 84 (2022) and *Jedlicka v. State*, 481 Md. 178 (2022). The court recognized that neither case was factually similar to Mr. Sexton's, but both discussed the applicability and appropriateness of a life sentence in a case involving crimes committed by juveniles.[5] The judge concluded:

---

[5] *Harris* involved a direct appeal after a trial and sentencing. The Supreme Court of Maryland determined that a life sentence with the possibility of parole for a juvenile offender convicted of first-degree felony murder was not grossly disproportionate under the Eighth Amendment to the United States Constitution. *Harris*, 479 Md. at 121-23.

(continued)

13

Those cases are dramatically different than the factual case – the factual predicate here in this case. This was a serious crime. [The trial judge] took into consideration Mr. Sexton's youth in rejecting a life without parole sentence. His sentence, although a lengthy one, is a sentence that is parole eligible. He has had a parole hearing.

### E. The Court's Ruling

After making those findings, the court denied Mr. Sexton's motion for reduction of sentence, stating:

I am not convinced that the sentence issued by [the trial judge] under all these circumstances is inappropriate, despite all of the things that Mr. Sexton has accomplished in his incarceration, and I am not minimalizing the effect on an inmate of 34 years in the Division of Correction.

But as I said earlier, this is a parole eligible sentence. And *whether or not Mr. Sexton has exhibited behavior that entitles him to a release from incarceration is, in this Court's mind, a parole board decision and not this Court's decision.*

Therefore, I do not find that the defendant has met the requirements under the statute to justify a reduction in sentence, and his motion is denied.

(emphasis added).

### DISCUSSION

Mr. Sexton contends that the circuit court applied the wrong legal standard and, thereby, abused its discretion in denying his motion for reduction of sentence under CP § 8-110. The State agrees and so do we.

---

*Jedlicka* involved an appeal from the denial of a motion to correct an illegal sentence pursuant to Maryland Rule 4-345(a). The Supreme Court of Maryland held, among other things, that a "stacked" sentence for non-homicide offenses was not a *de facto* sentence of life without the possibility of parole and, therefore, was not illegal under the Eighth Amendment. *Jedlicka*, 481 Md. at 195-98.

14

## A. Appealability and the Applicable Standard of Review

Whether there is a right to appeal the denial of a motion to reduce a sentence under JUVRA generally has not been addressed by the appellate courts of this State. We need not resolve that issue here. Generally, in other contexts, the denial of a motion for modification of a sentence is not an appealable order. Recently, in *Johnson v. State*, we recognized that Maryland's "Supreme Court has held that a 'discretionary denial' of a motion for modification of sentence, under Maryland Rule 4-345(e), which bears at least a superficial similarity to a motion for modification of sentence under [CP] § 8-110, generally is not appealable." 258 Md. App. 71, 87 (2023). In support of that statement, we cited *Hoile v. State*, 404 Md. 591, 615 (2008), a case in which Maryland's Supreme Court "distinguished 'motions to correct a sentence based upon an error of law and motions to reconsider sentence that are entirely committed to the court's discretion.'" *Johnson*, 258 Md. App. at 87 (quoting *Hoile*, 404 Md. at 617). In *Hoile*, the Court "concluded that only an appeal from the denial of a motion 'entirely' within a sentencing court's discretion is barred." 404 Md. at 617.

In other cases, Maryland's appellate courts have recognized that a ruling is appealable if it is not the result of the exercise of the court's discretion but rather an incorrect legal determination that the court lacked authority to grant the motion. *See, e.g., Brown v. State*, 470 Md. 503, 548-552 and 548 n.52 (2020) (discussing appealability of motions to modify under Maryland Rule 4-345(e) and the Justice Reinvestment Act, 2016

15

Md. Laws, ch. 515); *Coley v. State*, 74 Md. App. 151, 155-57 (1988) (the court, in refusing to consider modifying appellant's sentence, abused its discretion to revise a sentence which Md. Rule 4-345(b) vested in it). In *Johnson*, the issue was whether Johnson satisfied the eligibility criteria to seek relief under CP § 8-110. *Johnson*, 258 Md. App. at 87. In addressing that issue, the circuit court did not exercise discretion but rather ruled in each case that Mr. Johnson was ineligible to seek relief under the statute. *Id.* We held that those rulings constituted "legal determinations that were 'unqualified' and conclusively settled Mr. Johnson's rights in the subject matter and were, therefore," appealable final judgments. *Id.* That is the situation here as well.

### B. Analysis

Mr. Sexton argues that the circuit court applied the wrong legal standard, failed to recognize its authority to rule on his motion, and thereby abused its discretion in denying the motion. Under JUVRA, the decision to grant or deny a motion for reduction of sentence under CP § 8-110 generally rests in the discretion of the circuit court upon consideration of the required factors. Yet even under that deferential standard of review, the circuit court's discretion is tempered by the requirement that the court apply the "correct legal standards[.]" *Faulkner v. State*, 468 Md. 418, 460-61 (2020) (citing *Jackson v. Sollie*, 449 Md. 165, 196 (2016)); *Schisler v. State*, 394 Md. 519, 535 (2006) (quoting *LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 301 (2004)). When a court fails to do so, it abuses its discretion. *See, e.g.*, *Wilson-X v. Dep't of Human Res.*, 403 Md. 667, 675 (2008) ("[T]rial judges do not have discretion to apply inappropriate legal

16

standards, even when making decisions that are regarded as discretionary in nature.");

*Matter of Dory*, 244 Md. App. 177, 203 (2019) ("[T]rial courts do not have discretion to apply incorrect legal standards."). Whether the circuit court properly construed and applied CP § 8-110 is a question of law that we review *de novo. Mayor and City Council of Baltimore v. Thornton Mellon, LLC*, 478 Md. 396, 410 (2022) (citing *Schisler*, 394 Md. at 535); *Davis v. State*, 474 Md. 439, 451 (2021) (With issues of law, "[w]e are not looking at whether the trial court abused its discretion in its ultimate determination, but whether it applied the proper legal standard[] in exercising its discretion.").

Under Eighth Amendment[6] jurisprudence, a sentence imposed on a juvenile offender ordinarily must provide "some meaningful opportunity for release based on demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 75 (2010). *See also Montgomery v. Louisiana*, 577 U.S. 190, 209-10 (2016) ( "[L]ife without parole is an excessive sentence for children whose crimes reflect transient immaturity" and may be imposed only on "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility."); *Miller v. Alabama*, 567 U.S. 460, 465, 479 (2012) (Eighth Amendment prohibits sentencing juvenile homicide offenders to mandatory sentences of life without parole because such sentences fail to "consider[ ] a juvenile's 'lessened

---

[6] The Eighth Amendment to the United States Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. Marylanders' rights against cruel and unusual punishment are also protected by Article 25 of the Maryland Declaration of Rights. The appellant has not advanced any separate arguments on that basis so we address only the federal right.

culpability' and greater 'capacity for change[.]'"). One way of providing a meaningful opportunity for release is "by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Montgomery*, 577 U.S. at 212; *see also Farmer v. State*, 481 Md. 203, 215 (2022) ("[M]ost juvenile offenders must be afforded a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. And, often, that 'meaningful opportunity' comes through the availability of parole." (cleaned up)). But the possibility of parole is not the only way. *See Farmer*, 481 Md. at 230.

JUVRA offers another option. As Maryland's Supreme Court has recognized, in enacting JUVRA, the "General Assembly has both reformed the parole process and, for juvenile offenders sentenced as adults, provided another avenue for release of those who can demonstrate maturity and rehabilitation following a substantial period of incarceration." *Jedlicka*, 481 Md. at 182-183 (footnote omitted).

In *Farmer v. State*, 481 Md. 203 (2022), the State moved to dismiss Mr. Farmer's appeal on the ground that it was moot as a result of the enactment of JUVRA. *Farmer*, 481 Md. at 230. The State argued that "regardless of any deficiencies in the Maryland parole process, JUVRA provides the necessary meaningful opportunity for release and that Mr. Farmer's motion to correct an illegal sentence" pursuant to Maryland Rule 4-345(a) was "therefore moot." *Id.* Maryland's Supreme Court held that Mr. Farmer's claim was not cognizable under Rule 4-345(a) and, as a result, it was "unnecessary to reach the State's motion to dismiss." *Id.* at 230-31. In explaining its holding, the Court

commented that "[i]t seems quite possible that JUVRA will provide a meaningful opportunity for release for most juvenile offenders serving lengthy sentences, as its sponsors and advocates intended." *Id.* at 231. In a footnote, the Court highlighted some of the extensive legislative history that supported the idea that JUVRA was intended to provide the meaningful opportunity for release envisioned in *Graham*, *Montgomery*, and *Miller*:

> A sponsor of the Senate bill that was enacted as JUVRA remarked that the legislation would provide juvenile lifers an opportunity to be released from prison by proving they have reformed their lives and shown that "[r]edemption is possible." Written testimony of Senator Christopher West (March 26, 2021) submitted to the House Judiciary Committee concerning Senate Bill 494 (2021). In testimony before the House Judiciary Committee concerning the cross-filed House Bill, a retired circuit court judge noted that the federal Constitution requires that juvenile offenders have "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" and opined that the bill would "alleviate that constitutional problem" and bring "Maryland into conformance with what the Supreme Court has mandated and what other states have already done." Testimony of Gary Bair on January 21, 2021, concerning House Bill 409 (2021), available at https://tinyurl.com/5xr5pn6f at 4:35:23. Testimony by other advocates for the bill, such as the Campaign for Fair Sentencing of Youth and the Maryland Catholic Conference, also equated the legislation with the standards set by the Supreme Court in *Graham*, *Miller*, and *Montgomery*.

*Id.* at 231 n.24.

The plain language of CP § 8-110 makes clear that the General Assembly authorized and, indeed, required the circuit court to consider the factors listed in subsection (d) to determine whether to grant or deny a motion to reduce the sentence and to issue its decision in writing. There is no mention of parole in CP § 8-110, nor anything to suggest that the Parole Commission's authority takes precedence over the circuit

19

court's authority. There is also no provision in CP § 8-110 that permits the circuit court simply to defer to the Parole Commission or to pass to that body the question of whether an inmate is entitled to a reduction of sentence under JUVRA.[7] "[A] trial judge who encounters a matter that falls within the realm of judicial discretion must exercise [that judge's] discretion in ruling on the matter," and "[t]hat exercise of discretion must be clear from the record." *Gunning v. State*, 347 Md. 332, 351 (1997) (citations and emphasis omitted).

At the conclusion of the hearing on Mr. Sexton's motion for reduction of sentence, the court stated that it was "not convinced" that the sentence imposed by the original sentencing judge "under all these circumstances is inappropriate[.]" But the appropriateness of the original sentence, and the facts considered by the original sentencing judge, were not at issue before the court. The fact that Mr. Sexton's original sentence was parole-eligible did not impair his right to be considered for a sentence reduction by the circuit court under CP § 8-110. The circuit court was required to decide the merits of Mr. Sexton's motion for reduction of sentence pursuant to the requirements of the statute; under the relevant legal standards set forth in CP § 8-110, that decision belonged to the circuit court, not the parole board. Thus, the circuit court committed an error of law in ruling that "whether or not Mr. Sexton has exhibited behavior that entitles

---

[7] That is not to say that the circuit court must disregard materials concerning the Maryland Parole Commission. To the contrary, such materials may relate to one or more of the factors in CP § 8-110(d), a list that also includes "any other factor the court deems relevant." CP § 8-110(d)(11).

him to a release from incarceration is . . . a parole board decision and not this Court's decision." We shall vacate the judgment of and remand the case to the circuit court for further consideration of and a decision on Mr. Sexton's motion.

In so holding, we express no opinion on the proper result in deciding Mr. Sexton's motion—that matter is committed to the sound discretion of the circuit court. On remand, the circuit court should again weigh and address the factors set forth in CP § 8-110(d) and make the determinations required by CP § 8-110(c), both in light of the purpose of JUVRA and the Eighth Amendment jurisprudence from which the statute derives. The court must also comply with subsection (e), which requires that the court's decision be issued in writing and address the factors set forth in subsection (d). We agree with Mr. Sexton that, in light of the passage of time and the nature of the required factors, prior to making its determination, the circuit court should allow the parties to present any additional evidence developed since the last hearing.

> **JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**