*Joseph Michael Carini v. State of Maryland*, Case No. 543, Sept. Term, 2024, Opinion filed on January 29, 2026, by Berger, J.

CRIMINAL PROCEDURE ARTICLE § 4-202 – JUVENILE TRANSFER MOTION – TRANSFER FROM ADULT COURT – AMENABILITY TO TREATMENT

A juvenile charged in adult court may file a "reverse waiver" motion pursuant to § 4-202 to transfer his or her case from adult criminal court to the juvenile court. CP § 4-202(d) requires the court to consider the defendant's age, physical and mental condition, amenability to treatment in a juvenile institution, program, or facility, the nature of the alleged crime, and public safety. While each factor must be considered, the analysis is to be done with an eye towards the juvenile's amenability to treatment in the juvenile system in an effort to reduce the possibility of recidivism.

The circuit court did not abuse its discretion in denying the reverse waiver motion. The court's oral opinion showed that it thoroughly considered each of the factors with an overarching emphasis on the juvenile's amenability to treatment in the juvenile system. The court found that none of the available options in the juvenile system could better address the needs of the juvenile than any facility in the adult system. In doing so, the court particularly considered the diagnoses and treatment recommendations prepared by psychologists and the juvenile's previous interactions with the juvenile justice system.

Circuit Court for Baltimore County
Case No. C-03-CR-21-000899

IN THE APPELLATE COURT

OF MARYLAND

No. 543

September Term, 2024

_____

JOSEPH MICHAEL CARINI

v.

STATE OF MARYLAND

_____

Berger,
Beachley,
Sharer, J. Frederick
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed: January 29, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case arises from the denial of a motion to transfer to juvenile court filed by Jospeh Michael Carini ("Carini"), appellant. Following the denial of the motion, Carini entered a conditional guilty plea in the Circuit Court for Baltimore County and was convicted of attempted first degree murder. Carini was 16 years old at the time he committed the offense. The conditional guilty plea preserved Carini's right to appeal the denial of his transfer motion. Carini was sentenced to life imprisonment, all but 20 years suspended, followed by five years of supervised probation upon his release. This appeal followed.

## QUESTION PRESENTED

Carini presents one question for our review:

> Whether the trial court abused its discretion in denying Carini's
> motion to transfer the case to juvenile court.

For the following reasons, we affirm.

## BACKGROUND

### The Attempted First-Degree Murder

The following facts were proffered by the State at the January 31, 2024 hearing on Carini's conditional guilty plea and the April 22, 2024 sentencing hearing.

On February 24, 2021, a shooting occurred at an apartment occupied by Brandon Lauterbach.[1] Lauterbach was shot multiple times at close range, with five bullet casings recovered from the apartment. A witness described seeing three individuals fleeing from

---

[1] In the criminal information report, the victim is named as Brandon Robert Lauterbach. In the transcripts of the transfer motion, plea, and sentencing hearings, he is referred to as Brandon Louderback. For consistency, we will use the spelling Lauterbach.

the building, one of whom was holding a gun.  Carini was connected to Lauterbach through cell phone evidence.  The description of the fleeing individual holding the gun matched Carini.  Carini was then held at the Baltimore County Department of Corrections, at which time he made several phone calls that involved allegedly inculpatory statements, including statements regarding the disposal of a firearm.  The firearm Carini allegedly disposed of was ultimately recovered, and the gun was determined to be consistent with the type of gun that fired the bullets recovered from the apartment where Lauterbach was shot.  Carini was approximately 16 and a half years old at the time of the shooting.  Carini was charged as an adult with attempted first-degree murder, first-degree assault, and various firearms offenses.

### The Motion to Transfer to Juvenile Court

On March 17, 2021, Carini filed a motion to transfer his case from adult court to the Juvenile Court for the Circuit Court for Baltimore County, as permitted by Md. Code (2001, 2018 Repl. Vol., 2024 Supp.) § 4-202 of the Criminal Procedure Article ("CP"). Reports were prepared pursuant to CP § 4-202(e) to assist the court in its disposition of the case.

The court held a two-day hearing on the motion to transfer beginning on September 15, 2022.  Carini presented five witnesses in his defense.  First, Carini called Dr. Kristen Zygala, a licensed clinical psychologist who completed a psychological evaluation of Carini.  Dr. Zygala made several findings that tended to support Carini's amenability to treatment in a juvenile facility and recommended transfer.  Dr. Zygala noted that Carini's mental development was "extremely disrupted by his exposure to domestic

violence, paternal abandonment, and parental alcohol abuse" by his mother, and he was exposed to "recurring gun violence within his neighborhood," which led to a propensity for and diagnosis of Post-Traumatic Stress Disorder ("PTSD"). Dr. Zygala also noted that Carini had substance abuse issues and Attention Deficit Hyperactivity Disorder ("ADHD"). Dr. Zygala discussed Carini's prior involvement with the juvenile system and testified that he had received some services in the past including anger management classes and individualized therapy.

Dr. Zygala noted that Carini was doing well at the Charles H. Hickey Jr. School ("Hickey") and opined that he needed therapeutic and rehabilitative services including "individual therapy; family therapy; group therapy; meaningful victim awareness therapy; substance abuse treatment; life skills training; a male mentor; extracurricular pro-social activities; and medications for ADHD, PTSD, depression, and anxiety if necessary; as well as continuing education opportunities." Finally, Dr. Zygala testified that the Patuxent Youth Offender program typically did not offer individual therapy and focused instead on group therapy.

Next, Carini called Deirdre Steed-Vonse, a resource specialist supervisor for the Department of Juvenile Services ("DJS"), who was tasked with identifying appropriate services for Carini. Ms. Steed-Vonse recommended that Carini be placed at either the Cornell Abraxas Youth Center or the Victor Cullen Academy, secure juvenile facilities. At the facilities, Ms. Steed-Vonse testified, Carini could receive individual therapy, group therapy, and family therapy, could continue his online college coursework and substance abuse treatment, and could receive appropriate treatment for his PTSD. Finally, Ms. Steed-

3

Vonse testified that "step-down" services would be available to Carini upon his transition out of his juvenile placement as he reintegrated with society.

Next, Jessica Marvel, a licensed clinical social worker, testified. Ms. Marvel also interviewed Carini and prepared a report with recommendations for his treatment. Ms. Marvel testified that Carini had previously completed victim awareness and anger management programs and received some counseling that was not completed. Ms. Marvel testified that Carini was doing well at Hickey and was engaged in several programs, including the "We Rise" entrepreneurial mentorship program, the "Uncuffed Ministries" bible program, and was the president of his housing unit. Ms. Marvel opined that services available to Carini through Patuxent were limited, underfunded, and highly sought after, and Patuxent would be unable to address Carini's PTSD through a "trauma-informed" modality that is used in juvenile programs. Ms. Marvel acknowledged that Carini had been involved in four incidents while at Hickey in which he was the aggressor: a June 26, 2021 fight, a September 1, 2021 fight, a September 18, 2021 restraining before engaging in a fight, and an incident that occurred on March 20, 2022.

Todd Scott, Deputy Director of Strategic Partnerships and Business Development at the State of Maryland Department of Housing, next testified on Carini's behalf. Mr. Scott was a mentor for Carini through the "We Rise" program, and noted that Carini thoughtfully engaged with the program and was a leader for other participants.

Finally, Carini called Earl Burke, a counselor at Hickey who supervised Carini in a work program. Mr. Burke testified that Carini worked several days a week performing

general maintenance at Hickey. Mr. Burke testified that in conversations with Carini, he showed initiative and a genuine desire to better himself.

The State called Bryant Coleman, Carini's case manager at DJS. Mr. Coleman was tasked with supervising Carini beginning in November 2021, and was familiar with his prior juvenile system contact. Mr. Coleman testified that Carini had previously been on probation and received services in connection with a second-degree assault and a violation of probation for absconding from home. Mr. Coleman further indicated that there were earlier charges of second-degree assault, fourth-degree burglary, and disturbing school activities that were resolved at intake or pre-court supervision.

The court also reviewed a report prepared on September 8, 2021 by Dr. Peter Smith, a psychologist with DJS. Dr. Smith's report discussed Carini's prior involvement with the juvenile system, and noted previous domestic violence incidents between Carini's parents when he was young. Dr. Smith's report noted that Carini stated that his previous "legal involvement had been "[his] own decisions," and that his delinquent behavior had "been fun." Carini also indicated that he "gets mad a lot" and he "gets mad easily."

Reporting on Carini's trauma history, Dr. Smith noted that Carini had witnessed alcohol misuse by his mother, had witnessed gun violence in his neighborhood, and that Carini's mother indicated that Carini "has 'probably' been in five or six fights and has been the instigator 'in about half of them.'" Dr. Smith recommended that Carini participate in "a service with behavior management interventions," substance abuse treatment, a formal education or GED program, and "individual therapy that focuses upon grief/loss." Notably,

5

Dr. Smith did not diagnose Carini with PTSD or recommend placement in the juvenile system.

### *The Decision of the Motions Court*

After hearing testimony presented by witnesses for the defense and the State, the court delivered its oral ruling on September 19, 2022. The court delivered an extensive oral decision, ultimately denying Carini's motion to transfer to the juvenile court. The court's oral findings will be reproduced below.

Following the court's denial of the motion to transfer to juvenile court, Carini entered a conditional guilty plea to attempted first-degree murder on January 31, 2024, preserving his right to appeal the denial of the motion to transfer. On April 22, 2024, Carini was sentenced to life imprisonment, all but 20 years suspended, to be followed by five years of supervised probation. The court recommended that Carini be enrolled in the Patuxent Youthful Offenders Program. Carini filed a timely motion for modification of his sentence, which was to be held *sub curia* for five years, at which point the court would consider Carini's motion to modify his sentence based on his behavior while incarcerated. This appeal followed.

## DISCUSSION

### I. Applicable law and standard of review

The juvenile justice system is governed by Md. Code (1973, 2018 Repl. Vol., 2024 Supp.) §§ 3-8A-01 through 3-8A-35 of the Courts and Judicial Proceedings Article ("CJP"). The purpose of this subtitle is, in part, to:

provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest; to conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety; and to provide to children in State care and custody a safe, humane, and caring environment, access to required services, and provide judicial procedures for carrying out the provisions of the subtitle. Subsection (b) requires that the subtitle be liberally construed to effectuate those purposes.

*Davis v. State*, 474 Md. 439, 462 (2021) (discussing CJP § 3-8A-02(a)-(b)).

The juvenile court has exclusive original jurisdiction over a child who "is at least 13 years old alleged to be delinquent," "is in need of supervision," or "has received a citation for a violation." CJP § 3-8A-03(a)(1)-(3).[2] The juvenile court, however, does not have jurisdiction over "[a] child at least 14 years old alleged to have done an act that, if committed by an adult, would be a crime punishable by life imprisonment, as well as all other charges against the child arising out of the same incident, unless an order removing the proceeding to the court has been filed under § 4-202 of the Criminal Procedure Article." CJP § 3-8A-03(d)(1). "A person who attempts to commit murder in the first degree is guilty of a felony and on conviction is subject to imprisonment not exceeding life." Md. Code (2002, 2012 Repl. Vol.) § 2-205 of the Criminal Law Article ("CR").

The juvenile court similarly does not have jurisdiction over a child who is at least 16 years old and is alleged to have committed specified crimes, including first-degree

---

[2] A child who is alleged to be delinquent is a child who has allegedly committed a delinquent act "which would be a crime if committed by an adult." CJP § 3-8A-01(l)-(m).

assault and certain firearms offenses. CJP § 3-8A-03(d)(4). In these cases, "original jurisdiction over the juvenile lies in the adult court." *Rohrbaugh v. State*, 257 Md. App. 638, 654 (2023).

When such charges have been brought against a juvenile in the circuit court, the juvenile court may obtain jurisdiction pursuant to a "reverse waiver" if the circuit court grants a motion in accordance with CP § 4-202. *Id*. CP § 4-202(b) provides:

> (b) . . . a court exercising criminal jurisdiction in a case involving a child may transfer the case to the juvenile court before trial or before a plea is entered under Maryland Rule 4-242 if:
>
> (1) the accused child was at least 14 but not 18 years of age when the alleged crime was committed;
>
> (2) the alleged crime is excluded from the jurisdiction of the juvenile court under § 3-8A-03(d)(1), (4), or (5) of the Courts Article; and
>
> (3) the court determines by a preponderance of the evidence that a transfer of its jurisdiction is in the interest of the child or society.

To determine whether transfer to the juvenile court is in the interest of the child or society as required by CP § 4-202(b)(3), the circuit court must consider:

> (1) the age of the child;
>
> (2) the mental and physical condition of the child;
>
> (3) the amenability of the child to treatment in an institution, facility, or program available to delinquent children;
>
> (4) the nature of the alleged crime; and
>
> (5) the public safety.

8

CP § 4-202(d).

"The five considerations are not in competition with one another. They all must be considered but they are necessarily interrelated and, analytically, they all converge on amenability to treatment." *Davis*, 474 Md. at 464. *See also Rohrbaugh*, 257 Md. App. 661 ("No one factor can be given undue weight, and all of the factors must be considered with an eye toward the juvenile's amenability to treatment in the juvenile system.") (citing *Davis*, 474 Md. at 462-67). "With an eye both toward the welfare of the child and public safety . . . the court needs to make an assessment of whether it is likely that the child would benefit from an available DJS program better than he or she would from anything likely to be available in the adult system and whether that would reduce the likelihood of recidivism and make the child a more productive law-abiding person." *Id*. "If DJS does not have a program competent to address the issues defined that is available to the child and from which the child likely can benefit in a way that will produce better results than anything in the adult system and significantly lessen his danger to the public, a reverse waiver request should be denied." *Id*. at 455-56.

The burden of persuasion is borne by the juvenile to demonstrate, by a preponderance of the evidence, that the matter should be transferred to the juvenile court. *Rohrbaugh*, 257 Md. App. 654-55. We review for abuse of discretion the decision of the circuit court to deny a juvenile defendant's motion to transfer to juvenile court. *Id*. at 662. The trial court has abused its discretion "where no reasonable person would take the view adopted by the trial court, or when the court acts without reference to guiding rules or

9

principles." *State v. Robertson*, 463 Md. 342, 364 (2019) (cleaned up). We "will not disturb the circuit court's ruling, unless it is well removed from any center mark imagined by the reviewing court and beyond the fringe of what the court deems minimally acceptable." *Patterson v. State*, 229 Md. App. 630, 639 (2016) (internal quotations and citations omitted).

**II.     The circuit court did not err in denying Carini's motion to transfer to the juvenile court.**

Carini alleges that the circuit court erred when it denied his motion to transfer his case to the juvenile court. Carini asserts that the court did not properly address the five factors, as it was "'unduly influenced' by the nature of the alleged offenses and concerns for public safety." Carini further alleges that the court "fail[ed] to meaningfully consider [Carini's] 'amenability . . . to treatment' in a juvenile facility," and simply gave "lip service" to the amenability factor. The State argues that the court gave significant and appropriate consideration to each of the five factors, and concluded, in aggregate, that Carini did not meet his burden of persuasion to warrant transfer to the juvenile court. We agree.

The court heard testimony from several expert and lay witnesses for the defense, a witness for the State, and reviewed submitted exhibits including an evaluation produced by Dr. Smith on September 8, 2021. The court then issued its oral ruling, first noting:

> Maryland Criminal Procedure Code, Section 4-202(D), sets forth the transfer criteria. The age of the child, the . . . mental and physical condition of a child, amenability of a child[ to] treatment in an institution facility or program available to delinquent children, nature of the alleged crime and . . . the public safety. The Court is also guided by the [Supreme Court

10

of Maryland] decision in *Davis v. State*, 474 Md. 439, it's a 2020 decision.

The court then went on to address each of the five factors, reproduced below, while specifically noting that "the Court cannot consider each of the five factors under the statute in isolation. They have to be considered in the context of amenability and based on what the [Supreme Court of Maryland] has said in *Davis*, about what the Court needs to determine."

### *The age of the child*

First, the court noted:

> Let me go to the factors initially. The age of the child. The Defendant was, according to the waiver summary prepared by DJS, sixteen and seven months at the time of the alleged offenses. He is before the Court now eighteen and, I believe, one month.

### *The mental and physical condition of the child*

Addressing Carini's health, the court stated:

> In terms of his mental and physical condition, he is, depending on which report you read, five foot nine or five foot ten, he was five nine at a hundred and fifty-two pounds at the time the waiver summary was prepared. According to, I believe, Ms. Marvel's report, Defendant has gained some weight since he's been detained. He's now a hundred and sixty-eight pounds.
>
> He does not have any history of mental health, formal mental health diagnosis prior to these charges having been made. His mother did report that, by history, that he may have had ADHD, but it doesn't appear that they're in any medical reports or other documents to clarify that.
>
> He did not have any type of IEP. He wasn't in special education when he was in public school. He seemed to do

reasonably well in school until middle school, when he started having some behavioral issues. When he got in the ninth grade, he was expelled. Depending on who you listen to, in the waiver summary it says he was expelled for a year. When he spoke to one of the Defense experts he said he was suspended three times, but not expelled.

In any event, he left Chesapeake High School and went to [an] alternative school, but he did return to Chesapeake, and he has since gotten his GED. I think he was two classes short of that at the time that he was charged in connection with this case. So, he has, since he's been at, at Hickey, the Hickey School, he has obtained his GED.

The court continued, describing in detail the diagnoses produced in the evaluations by the experts addressing Carini's mental health:

Dr. Zygala and Ms. Marvel have told the Court that the Defendant suffers from PTSD. Dr. Smith, who conducted a psychological assessment in connection with the transfer summary, he did that on behalf of the Department of Juvenile Services last September, I believe, since the Defendant has been detained at Hickey.

And unlike the two experts retained by the Public Defender's Office, he did not make a finding that the Defendant had PTSD. And he did not make a specific recommendation of trauma informed therapy through DJS. He noted the Defendant had used marijuana in the past, but his score on the screening was not elevated and, thus, indicated that the Defendant should be referred for substance abuse evaluations, that he might benefit from.

Dr. Smith also did assessments on intellectual functioning, verbal memory, drug and alcohol abuse screening and trauma screening. He said, and I'm quoting, he does, the Defendant does not endorse significant symptomology across a variety of domains.

And I thought it was interesting in Dr. Smith's report, he said, when describing exposure to other events that relate to different types of abuse, his scale scores were all, quote,

12

none . . . . And for emotional and physical neglect, scales were minimum and low ranged.

. . . Dr. Smith, recommended behavioral management intervention, GED, which the Defendant had not obtained at that time, job training programs, possible individual therapy that focuses on grief or loss, since the Defendant reported the loss of two or three friends who died, including one from a gunshot wound. I believe there was also loss of a grandparent that was reported as well.

***The amenability of the child to treatment in an institution, facility, or program available to delinquent children***

The court then discussed Carini's amenability to treatment in a juvenile facility, beginning by addressing the programs he has received while at the Hickey School, and other juvenile offenses committed by Carini:

I have received extensive testimony, lots of exhibits in this hearing. The Defense retained two experts, Dr. Zygala . . . and Ms. Marvel, who is an LCSWC. I heard from Ms. Steed-Vonse, the DJS resource supervisor, two laypersons, Mr. Burke and Mr. Scott, I believe.

Mr. Scott talked about the mentor program that he is deeply involved and committed to. That was very apparent by his testimony. Mr. Burke talked about his work with Mr. Carini in the last four or five months, particularly with respect to Mr. Carini being involved in maintenance activities there at the Hickey School, because Mr. Carini has now completed his GED.

I also heard from the State's witness, the case manager for the Defendant since November of last year. Even though he has not been the Defendant's case manager the entire period of time that Mr. Carini has been involved with the juvenile justice system, it was clear from the witness' testimony that there is a file that DJS keeps, and he had parts of it. . . .

In addition, I received a number of reports about recidivism, a description of the Patuxent program, a

13

description of the programs available through DJS. And so, I, I want to make it clear that I have taken that, as well as the respective arguments, into consideration.

* * *

I think it's also important to note that when the Defendant was interviewed and assessed by Dr. Smith, the Defendant admitted that his peers, quote, did not have much power over him. His past legal involvement had been as a result of his own decisions.

He said that sometime, he's quoted as saying that sometimes delinquent behavior has been fun. He admits that he is sometimes easily agitated and when he feels disrespected, when people say or do something, he doesn't like being disrespected. And the Court finds that this mentality is reflected in the, the fights that he started getting involved in in middle school and then high school, when he was expelled.

The Defendant has been involved, or had contacts, with the juvenile justice system since the age of thirteen. Now, it is true that there were a number of matters that were disposed of without any type of formal petition having been filed. And I know [defense counsel] wanted to stress that point.

I, and I don't know from the, the case manager's testimony whether those informal resolutions were done with certain conditions or services or programs or not. So, I can't put much weight to that because I don't know the answer to that. I know that he's been involved since that time.

Then he ended up with charges of second-degree assault. They actually were more serious charges, but that's what it ended up going forward on and the facts were sustained on that. He was placed on probation and given certain terms and conditions.

Some terms and conditions he satisfied, as has been pointed out. The victim awareness and the anger management. Those were satisfied. The sixty-five hours of community service, according to the waiver summary, that was done with the assistance of the Defendant's biological father.

14

There, I heard quite a bit about how his father, he really hadn't had any kind of regular relationship with his father, consistent relationship until more recent times. But he did, with the assistance of his father, complete the sixty-five hours of community service. That was a condition of probation that was satisfied.

But then he did not follow through on other conditions. As has been pointed out, he was supposed to go through cognitive and dialectical therapy. He didn't do it. The testimony was he went for approximately one month.

He indicated to those who conducted assessments that he didn't like the male therapist, he didn't like the questions, I think one of the questions was how, how does this make you feel. So, he didn't like that . . . so he didn't follow through with it. And that became later a basis for violation.

The Choice program was a condition of probation. The Choice program, like the We Rise program, although not identical, is a mentor program. The Defendant had an opportunity for a, a mentor program, the Choice program, which is run through UMBC. This Court is familiar with that because this Court hears juvenile cases as well as adult criminal cases. And the Defendant did not follow through when he had the opportunity for the mentor program through Choice.

The Defendant was supposed to be living at home. . . .

He left home. And he, according to the DJS record, indicated that he had a job, he wouldn't disclose what kind of job he had been given. He had a place to stay, an apartment. Wouldn't disclose the location. So, he absconded from supervision.

He committed a new offense. So, the VOP was, the violation of probation, was not only for failure to follow through on that, those conditions, but also for his new offense, unlawful, or unauthorized removal of property.

The Defendant had an opportunity to participate in family therapy, which is another recommendation that Dr.

15

Zygala has identified is necessary. When the opportunity presented itself, it wasn't completed. Now, I'm told that it was his father's fault, and his father didn't want to participate. Bu[t] I don't have any verification of that. That's what was said. I didn't hear that from the case manager. And the Defendant was living with his mother.

I also note that there's a difference between the household environment that was described to Dr. Smith when he spoke to the Defendant and his mother versus fast forward to Dr. Zygala and Ms. Marvel. The, the, the domestic violence, I, I'm told that the Defendant was exposed to domestic violence for the first five years of his life. And there seems to be verification that there was domestic violence in the household between the Defendant's biological parents.

But when pressed for specifics about how much was witnessed by the child, I, I really don't have any details about that. And that was not, that was not something that Dr. Smith emphasized. I'm not suggesting that there was no domestic violence referenced by him. But he didn't seem to think that it was to the level of the Defendant fast forward being a person who should be diagnosed with PTSD.

I think the State makes a good argument in saying that a lot of this is self-reported. There is no independent verification, no nightmares, no sleep disturbances. A lot of what I'm being told is, you know, first five years of the Defendant's life, his parents fought, his father was abusive. Again, I don't have any doubt about that. But how much and to what extent this Defendant witnessed or recalled, I don't know. I don't have any independent verification of that.

There, he, he seemed to be doing okay in school until he got to middle school and he, he started acting out. Is that because he had PTSD or are there other reasons?

There was also this report about the Defendant's mother abusing alcohol. And let me just get my notes on that. In the report, I'm looking at page three of Dr. Smith's report, under additional stressors. This is the last paragraph. This is under trauma history.

16

Additional stressors that he identified, he meaning Mr. Carini, included reports of his mother having misused alcohol when he was younger. He later explained that this began when he was in sixth or seventh grade. He stated he did not like her behavior, and she would fuss about and take her problems out on me, end of quote.

It should be noted he says, quote, it's way better now. And his mother did not report a history of alcohol misuse. I wouldn't necessarily find that surprising. A lot of times people don't want to acknowledge alcohol abuse.

But I guess what I'm saying is that when you contrast the evaluation done by Dr. Smith on behalf of DJS back in September of 2021, and then fast forward to the evaluations done by Dr. Zygala and Ms. Marvel, there just seems to have been an increase in self-reporting and uncorroborated basis for the diagnosis. I, too, am not a doctor. . . .

. . . I'm the finder of fact here. And I have to make credibility determinations and I, I can't say that I, I find it completely credible that the Defendant suffers from PTSD. The State took both arguments and said well, if you do agree that it's PTSD, then here are the issues that we have.

It's a complex diagnosis and you can't address it in just a few months and the average stay at a juvenile facility would be 3.25 months . . .

But I, I, and, and I agree with that. I think that if, if he does, indeed, have PTSD it's going to take a lot more than three and a quarter months for something so traumatic. I've, I've seen plenty of CINA youth who have a PTSD diagnosis. I've seen plenty of adults as well with that diagnosis. And it is not something that is treated within a few months.

Dr. Smith [] identified the Defendant's home as stable and without conflict. Again, I recognize that sometimes folks are, are forthcoming and sometimes they're not. But I have reports that are, are different in, in many respects in terms of the degree of severity and the requirement of intervention that's needed.

17

> DJS has a staffing. They conducted a staffing, and they made a determination, identified hardware secure for this Defendant, Victor Cullen, or either an out of state facility based on what was determined by Dr. Smith. . . .

The court then went on to make its determination on Carini's amenability to treatment:

> So, there's a saying that I think is very true. And I think it applies in this case as far as our discussion about amenability to treatment and the progress that Mr. Carini has had at the Hickey School. And it's that two things can be true. On the one hand, there's no question that Mr. Carini has, while he's been at the Hickey School, been involved in several volunteer programs.
>
> Uncuffed Ministries, we have a letter in the record from them. They said their access was limited. They started working with him December of 2021. It was limited and I suspect that's because of the pandemic. But they had good things to say. And Mr. Scott testified about We Rise, and he has worked with Mr. Carini the last four or five months in that program. And he had good things to say.
>
> Mr. Carini had told Dr. Smith and others that when it came to his remote learning, before he got in Hickey, he just didn't do the work. He, he wasn't motivated. Since he's been at Hickey, he has done the work remotely and is enrolled in the community college and seems to be doing well. He has the ability to do the work.
>
> He received glowing testimony from Mr. Burke, who is a counselor at Hickey and who has worked with Mr. Carini and talked about Mr. Carini's willingness to work in maintenance and to volunteer to do things. And so, he's been working with him for the last several months as well. And he talks about how Mr. Carini is respected by the other youth and he's the president of his unit.
>
> And so, [] he has these things that are in his favor. But I say two things can be true because on the one hand, Mr. Carini does these things that are positive. But on the other

18

hand, his behavior has continued to be assaultive in nature since the time he's been [detained].

There hasn't been just one incident where he was considered an aggressor. June 26, [2021] he was the aggressor and assaulting another peer, September 1st, 2021, he was identified as the aggressor, joined in an assault, September 18th, 2021, he had to be restrained by staff, he was attempting to fight another youth, he was identified as an aggressor. And as recently as March 30th of 2022 another fight where he was listed as an aggressor.

One of the differences between this Defendant and the Defendant in *Davis*[ *v. State*, 474 Md. 439 (2021)] is that the Court noted in its opinion that the Defendant in *Davis* had not been aggressive or disrespectful toward peers or staff. And was forthcoming about the events that led to his detention.

### *The nature of the alleged crime*

The court first noted the nature of the crime at the start of its oral ruling, stating:

The Defendant is charged with a number of felony offenses, including, but not limited to, attempted first degree murder, first degree assault, use of a handgun in the commission of a crime of violence and additional charges.

After discussing amenability to treatment, the court when on to further address the nature of the crime.

So, I have not talked about the alleged crimes or public safety. We know what the charges are. In looking at the application for statement of charges, which was attached to the waiver summary, the allegations are that the Defendant's mother's cell phone, or at least a phone that was registered to the Defendant's mother, was searched.

It was seized and searched pursuant to Court Order after the shooting. And it revealed there were text messages and a call between the victim and this Defendant approximately one hour before the shooting occurred. The victim was shot five to six times inside his apartment. I've already heard the State's

19

impact, victim impact statement and the description of the nature and extent of the injuries.

The application for statement of charges shows that there were photographs found when a Co-Defendant's phone was searched as well, pictures showing not only the Co-Defendant, but more importantly, this Defendant with guns. I don't know in a trial whether that would be admissible. There's some evidentiary analysis that would have to go along with it. The State tells me today that this shooting was over a $30 debt. I don't have that kind of detail in the application for statement of charges.

### The public safety

Finally, the court addressed the public safety.

But there is a significant public safety concern. So, how does, how do we take all of that information and look at amenability to treatment? I do believe that the past performance in receiving the opportunity for DJS services is relevant. It is relevant. Is it dispositive? No. But it is relevant. And there is a history here of the Defendant having the opportunity to get services, such as individual counseling, such as family centered therapy and he did not comply.

He pick[ed] and chose what he wanted to do. And the reason for him not following through with individual therapy, that he didn't like a male therapist, he didn't like the questions that were asked, they give this Court a lot of cause and concern.

What happens if the Defendant is in the juvenile system, he gets committed to a facility and he doesn't like the therapist that he's given there? Or doesn't like the questions that are asked? What happens? What happens with that? That's a rhetorical question.

We're talking about a very serious set of circumstances here. And the stakes are very high for this Defendant, but they're also high for the public. And so, the public needs, and the Court needs to know that the Defendant is going to receive services that are best.

20

### *The decision of the court*

Before beginning its oral ruling, the court noted that it was required to consider the factors in the context of *Davis*, noting that the court:

> . . . needs to determine whether treatment programs would, in fact, be available to the child and the Court needs to make an assessment of whether it is likely that the child would benefit from an available Department of Juvenile Services program better than he or she would from anything likely to be available in the adult system. And whether that would reduce the likelihood of recidivism and make the child a more productive, law-abiding person.

After its lengthy discussion of the five factors, the court made its final determination:

> So, . . . the question is under *Davis*, would the Defendant benefit from available DJS programs better than anything likely to be available in the adult system and whether that would reduce the likelihood of recidivism and make that child a more productive law-abiding person.
>
> And after considering all the evidence and comparing what's available at Patuxent versus what is available in the juvenile system, the answer, my answer is no. I don't find that what has been suggested here is better that, than anything likely to be available in the adult system.
>
> I don't find that it would, that what's been offered or suggested in the juvenile system would reduce the likelihood of recidivism and make Mr. Carini more productive, a more productive law-abiding person. Patuxent does have a six-month assessment process. It does create an individualized plan for each person.
>
> Even with individualized plans, based on my reading of the exhibit, there are certain components that every person who is admitted, and I'm talking specifically about the Youthful Offenders Program. They will have to participate in those. The evaluation is done, is based on a formal history, risk level and needs assessment.

21

It is not a voluntary program. There are circumstances that develop if someone says well, I don't like this therapist or I want a woman therapist, you don't have those kind of options, you don't have that kind of flexibility in Patuxent. That's not based on what I'm reading anyway. Or that is based on what I'm reading, I should say. I just don't see that.

I also note that with Patuxent, they have conditional release when a youth is in that program, as they progress, they get certificates, and they move up. And so, they increase their potential to be released back into the community and they are, there are community-based services that are available.

With the changes in the way the juvenile system is working now, if, if the Defendant is in a juvenile facility, he completes it three, four, five months and then he's on some type of stepdown program, if he doesn't follow through with additional therapy or other conditions, except for obey all laws or absconding, then really the only thing the Court can do is say all right, I want you to go back. I want you to try this program.

The Court can't punish him, and the juvenile system is not about punishment. And it is correct, once, he's eighteen now, once he's twenty-one, that's it. That's it. And so, for something so serious, so egregious and for someone who has a lengthy track record of non-compliance, I'm, I'm not satisfied that the burden has been met. So, the Motion is denied. Thank you.

### *Application to Carini's case*

As discussed above, the court must consider each of the five factors provided in CP § 4-202(d), and in doing so, the court must assess "whether it is likely that the child would benefit from an available DJS program better than he or she would from anything likely to be available in the adult system and whether that would reduce the likelihood of recidivism and make the child a more productive law-abiding person." *Davis*, 474 Md. at 464. If DJS lacks such a program "that will produce better results than anything in the adult system and

22

significantly lessen his danger to the public, a reverse waiver request should be denied[.]" *Id*. In the present instance, the court noted that based on the expert testimony promulgated by the defense, Carini had PTSD, which would take significant time to address. The court was not convinced that Carini's PTSD would be adequately addressed in 3.25 months, the "average stay at a juvenile facility."

The court additionally found that despite Carini's repeated contacts with the juvenile system, he was continuing to engage in criminal activity. The court found noteworthy that while at Hickey, although he was making progress in other ways, Carini had been involved in several altercations, and was the aggressor in all instances. Notably, the court specifically found that Carini had been offered therapy before, but did not follow through with treatments because he did not like the assigned therapist, or the questions asked. The court specifically found that Carini would be better suited for the Patuxent youth offender program, as, if accepted, it would be a non-voluntary six-month program that Carini would be required to complete.

Regarding its overall finding, the court specifically stated, "I don't find that it would, that what's been offered or suggested in the juvenile system would reduce the likelihood of recidivism and make Mr. Carini more productive, a more productive law-abiding person." As noted, *Davis* requires that the court consider "whether it is likely that the child would benefit from an available DJS program better than he or she would from anything likely to be available in the adult system and whether that would reduce the likelihood of recidivism and make the child a more productive law-abiding person." 474 Md. at 464.

Carini's case is similar to the appellant in *Rohrbaugh*. Rohrbaugh was charged as an adult in two cases following two separate incidents with a firearm. 257 Md. App. at 643. In considering Rohrbaugh's motion to transfer to juvenile court, the circuit court noted that Rohrbaugh would only be eligible for juvenile services until age 21, and the court was concerned "about that limited time frame given that an 'awful lot of therapy . . . ha[d] been recommended.'" 257 Md. App. at 663. The court found that the adult system would have longer jurisdiction and could offer Rohrbaugh services for a greater period of time. *Id*. Similarly, in considering Carini's motion to transfer to the juvenile court, the circuit court also expressed trepidation over the limited amount of time Carini would have access to juvenile services, particularly considering that Dr. Zygla had diagnosed Carini with PTSD, which would take significant time to address.

When considering Rohrbaugh's amenability to treatment, the circuit court noted that Rohrbaugh had previous DJS involvement, and the crimes for which he had most recently been charged were committed while Rohrbaugh was receiving juvenile services and therapy. 257 Md. App. at 64. "The court found that, despite 'a two[-]year involvement between [Mr. Rohrbaugh] and DJS[,]' there had been 'no improvement.' Instead, the court found, 'the same dangerous behavior or worse' had continued[.]" *Id*. Based on this conduct, court questioned Rohrbaugh's amenability to treatment. *Id*.

Turning to the instant case, the court conducted a thorough analysis of Carini's prior DJS involvement, and although the court commended Carini for his progress at Hickey, the court expressed concern for Carini's DJS history and the recent incidents that occurred

24

while at Hickey where Carini was the aggressor. The court additionally found troubling Carini's failure to follow through with therapy in the past.

In *Rohrbaugh*, this court held "that the circuit court did not abuse its discretion in denying Mr. Rohrbaugh's reverse waiver motion. The court conducted a thorough analysis of each of the statutory factors and issued a well-reasoned decision based on those factors and the circumstances of the case." 257 Md. App. at 667. We concluded that "there were no programs in the juvenile system that were 'competent to address the issues defined' and 'from which the child likely [could] benefit in a way that [would] produce better results than anything in the adult system and significantly lessen his danger to the public[.]'" *Id.* at 666 (quoting Davis, 474 Md. at 465-66).

Similarly, we hold that the circuit court did not abuse its discretion in denying Carini's reverse waiver motion. The circuit court did exactly what was required of it by our case law when it denied Carini's motion to transfer to juvenile court. The court concluded:

> So, . . . the question is under *Davis*, would the Defendant benefit from available DJS programs better than anything likely to be available in the adult system and whether that would reduce the likelihood of recidivism and make that child a more productive law-abiding person.
>
> And after considering all the evidence and comparing what's available at Patuxent versus what is available in the juvenile system, the answer, my answer is no. I don't find that what has been suggested here is better that, than anything likely to be available in the adult system.
>
> I don't find that it would, that what's been offered or suggested in the juvenile system would reduce the likelihood

25

of recidivism and make Mr. Carini more productive, a more productive law-abiding person.

The court's discussion of each of the factors, and specifically Carini's amenability to treatment, was exceptionally thorough. The court clearly did not merely give "lip service" to the amenability factor. There is no support in the record for Carini's contention that the court overemphasized the nature of the crime or the public safety. All of the factors must be considered in context, and with an eye towards amenability to treatment in the juvenile system. That is precisely what the circuit court did in this instance. The court, therefore, in no way abused its discretion in denying Carini's motion to transfer to the juvenile court. Accordingly, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**